UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA

vs.                                  5:20-cr-243

DENNIS J. NELSON,

                    Defendant.
------------------------------------------------x

**TRANSCRIPT OF COMPETENCY HEARING**
**BEFORE THE HONORABLE MARIAN W. PAYSON**
May 5, 2022
100 South Clinton Street, Syracuse, NY


APPEARANCES

For Government:

     OFFICE OF THE U.S. ATTORNEY
     Northern District of New York
     P.O. Box 7198
     100 South Clinton Street
     Syracuse, New York 13261
     BY:  CARL G. EURENIUS, ESQ.
          Assistant U.S. Attorney


For Defendant:

     OFFICE OF FEDERAL PUBLIC DEFENDER
     Northern District of New York
     4 Clinton Square
     Syracuse, NY 13202
     BY:  RANDI JUDA BIANCO, ESQ.




          *Eileen McDonough, RPR, CRR*
     *Official United States Court Reporter*
               *P.O. Box 7367*
          *Syracuse, New York 13261*
               *(315)234-8546*

1                (1:28 p.m.)

2            THE CLERK:  Case is United States versus Dennis

3    Nelson, 20-cr-243.  Counsel, please note your appearances for

4    the record.

5            MR. EURENIUS:  Carl Eurenius for the United States.

6    Good afternoon, Your Honor.

7            THE COURT:  Good afternoon.

8            MS. BIANCO:  Good afternoon, Your Honor.  Randi

9    Bianco for Dennis Nelson, who is seated at my right.  My IT

10   person is behind me.

11           THE COURT:  Nice to see you both in person.  I

12   don't think I've met either one of you in person.  And you

13   are seated next to your client who would like to be addressed

14   as Ms. Nelson, is that correct?

15           THE DEFENDANT:  Yeah.

16           THE COURT:  Okay, very good.

17           All right.  Are both sides prepared to proceed with

18   the competency hearing?

19           MR. EURENIUS:  Yes, Your Honor.

20           MS. BIANCO:  Yes, Your Honor.

21           THE COURT:  Mr. Eurenius.

22           MR. EURENIUS:  Judge, the government has one, and

23   only one, witness in this case, it's Dr. Miriam Kissin,

24   forensic psychologist.  And should I call her at this time?

25           THE COURT:  Yes, please.

*Miriam Kissin - Direct - Mr. Eurenius*                    3

1            MR. EURENIUS:  The government calls Miriam Kissin

2    to the stand.

3            THE CLERK:  Raise your right hand.

4            *MIRIAM KISSIN*, called as a witness and being

5    duly sworn, testifies as follows:

6            THE COURT:  Good afternoon.  You may proceed.

7    *DIRECT EXAMINATION BY MR. EURENIUS:*

8    Q    Dr. Kissin -- can I call you Dr. Kissin?

9    A    Yes.

10   Q    Good afternoon, Dr. Kissin.  How are you employed?

11   A    I'm a forensic psychologist for the Federal Bureau of

12   Prisons at the Federal Medical Center Devens.

13   Q    Where is the Federal Medical Center Devens?

14   A    It's in Devens, Massachusetts.

15   Q    How long have you been a forensic psychologist there?

16   A    At Devens, I've been there for 13 years.

17   Q    And how long have you been with BOP?

18   A    13 years.

19   Q    Now, Dr. Kissin, what is your -- you're a forensic

20   psychologist?

21   A    Yes.

22   Q    And in this case were you referred for an evaluation of

23   the defendant, Dennis Nelson?

24   A    Yes.

25   Q    And were you referred that as a result of an order from

*Miriam Kissin - Direct - Mr. Eurenius* 4

1    this court?

2    A    I was, yes.

3    Q    And did you conduct a psychological evaluation of

4    defendant Dennis Nelson?

5    A    I did.

6    Q    And did you -- in your expert opinion did you reach a

7    diagnosis about the psychological condition of Dennis Nelson?

8    A    I did.

9    Q    Relative to the defendant's competency to stand trial in

10   this matter?

11   A    Yes.  In the course of that evaluation, yes.

12   Q    And what was that diagnosis?

13   A    My diagnosis was mixed personality disorder with

14   antisocial and borderline features, and borderline

15   intellectual functioning.

16   Q    And to reach that conclusion, the evaluation of the

17   defendant, did that include a number of things including

18   reviewing the materials provided by the government and the

19   defense?

20   A    Yes.

21   Q    And are your conclusions and your opinion contained in a

22   report?

23   A    They are.

24   Q    And that report has been issued to the Court, is that

25   correct?

*Miriam Kissin - Direct - Mr. Eurenius*                5

1    A    Yes, correct.

2             MR. EURENIUS:  One moment, Your Honor.

3             THE COURT:  Yes.

4             MR. EURENIUS:  Judge, the report is marked as

5    Defendant's Exhibit 10, and I would -- the government has no

6    objection to the admission of the Doctor's report in this

7    regard.

8             THE COURT:  The report shall be admitted

9    Defendant's Exhibit 10.

10            (Defendant's Exhibit 10  received in evidence.)

11            MR. EURENIUS:  The report that is -- if I might

12   have a discussion at sidebar regarding the addendum to the

13   report?

14            THE COURT:  Okay.  I'm not talking about the

15   addendum.

16            MR. EURENIUS:  Yes, Your Honor, okay.  The

17   government has no objection to the admission of the report

18   itself.

19   Q    Now, Doctor, in your expert opinion, did you reach a

20   conclusion regarding the defendant's competency to stand

21   trial?

22   A    I did.

23   Q    And what is that?

24   A    I opined that Ms. Nelson does not suffer from mental

25   illness or mental defect that interferes with her ability to

*Miriam Kissin - Cross - Ms. Bianco*                         6

1    participate in the legal process to understand the charges

2    against her or her capacity to work with her attorney in her

3    defense.

4             MR. EURENIUS:  Thank you.  No further questions.

5             THE COURT:  Ms. Bianco.

6             MS. BIANCO:  Your Honor, may I use the podium?

7             THE COURT:  Yes.

8             MS. BIANCO:  Can I take my mask off during my

9    questioning?

10            THE COURT:  Let me ask the ladies in the front of

11   the bench.  Yes, you may.

12   *CROSS-EXAMINATION BY MS. BIANCO:*

13   Q    Good afternoon, Dr. Kissin.

14   A    Good afternoon.

15   Q    Would you agree that Dennis Nelson is an unreliable

16   historian of her history?

17   A    I'm not sure I would necessarily qualify it fully like

18   that, maybe inconsistent at times.  I wouldn't go that far.

19   Q    In the past she has been evaluated by mental health

20   officials at the Bureau of Prisons, correct?

21   A    Correct.

22   Q    And showing you Defendant's Exhibit 8, she has been

23   classified in the past as an unreliable historian, is that

24   correct?

25   A    I'm not sure -- I'm sorry, it's in front of me.

*Miriam Kissin - Cross - Ms. Bianco*

1   Q     Presented as a poor historian?

2   A     So this is not -- what I'm looking at is New York State,

3   not a bureau.

4   Q     I'm sorry, the Office of Mental Health.

5   A     Correct.  So that's not the previous evaluation.  Bureau

6   looks like that's records from New York State Department of

7   Corrections or something of that matter.  And it does say

8   there that this evaluator or that interviewer did find that

9   to be the case, presented as a poor historian, I do see that.

10  Q     Do you think she was a poor historian or do you think

11  she's an accurate historian?

12  A     Are you talking about in this particular matter?

13  Q     In this particular matter.

14  A     I wasn't present during that evaluation, I couldn't

15  really opine.  But in terms of my evaluation?

16  Q     Yes.

17  A     The information that she presented was overall

18  consistent with previous reports or previous evaluations that

19  I received in terms of her mental health history, history of

20  incarceration, childhood history.  Again, there wasn't

21  anything significantly inconsistent.  I think there were

22  things that she didn't necessarily say that she might have

23  reported previously but they were not necessarily in contrast

24  to other information.

25  Q     So you're saying she's an accurate historian?

*Miriam Kissin - Cross - Ms. Bianco*                    8

1   A    I did not find her to be inaccurate based on previous

2   information.

3   Q    You wanted to verify her history through other sources,

4   is that correct?

5   A    That is one of the things that I did do, correct.

6   Q    And in the course of your examination, you reviewed a

7   number of documents, correct?

8   A    Correct.

9   Q    And that included medical records from the New York

10  State Office of Mental Health?

11  A    Yes.

12  Q    It included medical records from the Department of

13  Corrections?

14  A    Yes.  A variety from New York State, yes.

15  Q    Medical records from the Bureau of Prisons?

16  A    Yes.

17  Q    Discovery materials in this case?

18  A    Yes.

19  Q    And you received materials from my office, the Office of

20  the Federal Public Defender, consisting of her records of

21  previous state and federal cases, correct?

22  A    Yes.

23  Q    And she had numerous arrests for sending threatening

24  letters?

25  A    I believe that's the case, yes.

*Miriam Kissin - Cross - Ms. Bianco*                    9

1    Q    And you reviewed Ms. Nelson's prior behavior in all

2    those arrests?

3    A    I did not review her behavior in those arrests.  I did

4    review the mental health records.  I'm not sure -- I did not

5    review the court records or discovery for previous arrests.

6    Q    So the records that the Federal Public Defender's Office

7    sent you with regards to her previous threatening letters,

8    you didn't review any of that?

9    A    You asked me if I reviewed her behavior at arrests.  So

10   I don't recall reviewing specific arrest information, so

11   police department or marshals, in terms of behavior at

12   arrests, but I did review previous information that included

13   previous charges of sending threatening letters.

14   Q    Okay.  So you reviewed all of the materials the Federal

15   Public Defender's Office sent you?

16   A    Yes, correct.

17             THE COURT:  Can I just interrupt you to ask the

18   folks in the gallery to please keep their masks on.  Anyone

19   in the gallery, please put a mask on.  Thank you.  Go ahead.

20   Q    Dennis Nelson has received psychiatric care for the

21   majority of her life, is that right?

22   A    Yes.

23   Q    And you were aware that an MRI was performed in 1991

24   that showed left brain hypoplasia?  I'm showing you

25   Exhibit 2.

1    A    Yes, correct.

2    Q    And that means she had an underdeveloped left hemisphere

3    of her brain, is that right?

4    A    I believe that's what that means.  I'm not a physician

5    but that's my understanding based on other records where that

6    was more fully explained, yes.

7    Q    And the left hemisphere is where speech and language are

8    processed, correct?

9    A    For the most part.

10   Q    And you're aware of her educational background, correct?

11   A    Yes.

12   Q    And she claims she left school after being expelled in

13   the fifth grade?

14   A    Correct.

15   Q    Right.  And are you saying that she was an accurate

16   historian, that she only completed a fifth grade education,

17   or did you find records that contrasted that?

18   A    I'm not exactly sure.  I do believe that there was

19   significant limitations.  She was institutionalized for many

20   years and there was significant limitations in terms of

21   completing school, but I did not delve into school records

22   specifically so I'm not sure if that's exactly accurate,

23   whether it's fifth grade or another grade, but I believe that

24   several records indicated that she did not complete her

25   education.

*Miriam Kissin - Cross - Ms. Bianco*                    11

1  Q    When you say "did not complete her education," did not

2  complete high school or did not complete elementary school?

3  A    Again, so I believe that she told me that it was through

4  fifth grade.  I would have to check my -- I don't recall

5  exactly but I know that she did tell me that she did not

6  complete her education and that she might have some

7  difficulty around literacy because of that.

8  Q    And you reviewed her previous scores on IQ testing,

9  correct?

10  A    Correct.

11  Q    Okay.  And her last IQ test was given in 1992, is that

12  right?

13  A    Again, I'm not sure exactly.  I know there was previous

14  testing, I'm not sure of the years but I do recall that there

15  were previous.

16  Q    Showing you Defendant's Exhibit 11, did you review that

17  particular document, her IQ test?

18  A    There were about 6 inches of records I did review.  I'm

19  not quite sure if that was the last that was given but I do

20  recall that there was reviewing previous evaluations of which

21  this was one.

22  Q    And she had a full scale IQ of 76, is that right?

23  A    Yes.

24  Q    And a verbal IQ of 72?

25  A    Correct.

*Miriam Kissin - Cross - Ms. Bianco*                    12

1    Q    Okay.  And you agree that Dennis presents with cognitive

2    functioning -- excuse me.  You agree that Dennis presents,

3    cognitive functioning appeared consistent with previously

4    reported scores in the borderline range?

5    A    Yes, that would be in the borderline range.

6    Q    And her concrete functioning is limiting?

7    A    I'm sorry, her what functioning?

8    Q    Her concrete functioning is limited, you said that,

9    correct?

10   A    It should have said cognitive.  Maybe that's a typo, I'm

11   not sure.

12   Q    Okay, Exhibit 10, page 10, please.

13   A    Is that my report?

14   Q    Your report.

15   A    Cognitive functioning is what my report says.

16   Q    I apologize.  So her cognitive functioning is limited?

17   A    Correct.

18   Q    And when you reviewed her IQ assessment -- you said you

19   did review that, correct?

20   A    Yes.  I believe there were several times of testing but

21   that may have been one of the last ones.

22   Q    And it took her five sessions to complete the test which

23   is frequently accomplished in just one session, Exhibit 11,

24   page 3, please?

25   A    That is what that says, correct.

*Miriam Kissin - Cross - Ms. Bianco*

1  Q    Okay.  And have you ever done IQ tests?

2  A    I have.

3  Q    And usually it's completed in one session, right?

4  A    Certainly not in our setting.

5  Q    And that's because you are in a setting with people who

6  have psychiatric illnesses, correct?

7  A    There is a lot of limitations, time issues.  I mean,

8  it's a secure setting with a very structured day and

9  sometimes that has to do with the individual's difficulty

10 managing a long test.  Some of it might have to do with time

11 constraints that are more institutional.  It's more likely

12 than not that testing can take several attempts, not just

13 one.

14 Q    But for a person who has a normal cognitive functioning,

15 usually it's done in one setting, correct?

16 A    It certainly can be done.  The test is geared that it's

17 able to be accomplished within one setting.

18 Q    In this particular instance, Exhibit 11, page 2, the

19 reason there were five different sessions is because she kept

20 terminating the sessions, is that right?

21 A    I don't know.  Again, I was not a party to that testing

22 session but that appears that's what it says in the document.

23 Q    And this is records that you had reviewed?

24 A    Yes.

25 Q    Okay.  And each time they asked her to expand on the

1    answers, she terminated the session, is that right?  And I'm

2    referring back to that same Exhibit 11, page 2.

3    A    That is what it says.

4    Q    Okay.  Dennis has a history of not being cooperative

5    with authorities, would that be a fair statement?

6    A    I would say that, yes, there is definitely a history

7    consistent with that.

8    Q    And she has been diagnosed in the past with mental

9    disease or defect as defined by the Diagnostic and

10   Statistical Manual of Mental Disorders, correct?

11   A    I think what you're asking is has she had previously

12   been diagnosed with mental health issues.

13   Q    Yes.

14   A    Yes, certainly.

15   Q    And the Diagnostic and Statistical Manual of Mental

16   Disorders, that's known as the DSM, correct?

17   A    Correct.

18   Q    Let's talk about her previous diagnoses for mental

19   disease or defects, okay?

20   A    Okay.

21   Q    You said you diagnosed her with a borderline

22   personality, correct?

23   A    Yes.

24   Q    Would you agree that personality disorders are

25   considered mental disorders of unclear etiology that impair

*Miriam Kissin - Cross - Ms. Bianco*                    15

1    the individual in a pervasive way with respect to their
2    perceptions, managements of feelings, and functioning of
3    major life spheres, such as relationships and work, et
4    cetera?  Would you agree with that statement?
5    A    The first I would for the most part.  I think some of
6    them we do have some sense of what might contribute to them,
7    but, yes, overall their personality disorders are manifested
8    problems with interpersonally and with one's social setting.
9    Q    Let's talk about delusional disorders, okay?  Dennis was
10   diagnosed with a delusional disorder when she arrived at
11   Devens in December of 2020, correct?
12   A    I believe that that was the diagnosis that was -- that
13   had been in the records.  I'm not sure -- actually, I guess
14   I'm not sure, that might have been in the records but I'm not
15   sure about that diagnosis, where that came from.
16   Q    Well, showing you Exhibit 4 dated 12/16/2020, where it
17   has a brief psychiatric history, do you see that?  And the
18   psychiatrist diagnosis includes delusional disorder, mixed
19   type, with grandiose and somatic delusions, do you see that?
20   A    Yes.  I think my point is not that that wasn't in the
21   records, but I'm not clear that that was the diagnosis that
22   came from Devens at the time that she arrived or that was the
23   psychiatrist, Dr. Kennedy, our psychiatrist, took from
24   records that were available at the time that she came into
25   Devens.

*Miriam Kissin - Cross - Ms. Bianco*

1  Q    But during your evaluation she continued to receive

2  treatment from her provider for the diagnosis of delusional

3  disorder, correct?

4  A    Um --

5  Q    And your report, Exhibit 10, at page 6, don't you say

6  that?

7  A    So she received antipsychotic medications that she's

8  been on for a long time, that's correct.

9  Q    Well, did you say that she was receiving treatment from

10  her provider for a diagnosis of delusional disorder?

11  A    Yes.  That is what the psychiatric diagnosis in the

12  records is and she was on antipsychotic medication.

13  Q    And her diagnosis was delusional disorder, mixed type,

14  grandiose, and somatic delusions, correct, and that was in

15  December of 2020?

16  A    Yes.

17  Q    And she had a history of prior mental health treatment

18  which included psychotropic medications, emergency room

19  treatment, and numerous inpatient hospitalizations, correct?

20  A    Yes.

21  Q    Let's talk about the essential features for delusional

22  disorders under the DSM.  You're familiar with that, correct?

23  A    I am.

24  Q    So, you need to have the presence of one or more

25  delusions that persist for at least one month or longer,

*Miriam Kissin - Cross - Ms. Bianco*                    17

1    correct?

2    A    Correct.

3    Q    The Criterion A for schizophrenia has never been met,

4    that's another essential feature?

5    A    Correct.

6    Q    Apart from the impact of the delusions or its

7    ramifications, functioning is not markedly impaired and the

8    behavior is not obviously bizarre or odd, correct?

9    A    Correct.

10   Q    If manic or major episodes have occurred, they have been

11   brief relative to the duration of the delusional period,

12   correct?

13   A    Correct.

14   Q    The disturbance is not attributable to the physiological

15   effects of a substance, like cocaine, or another medical

16   condition, like Alzheimer's, and is not better explained by

17   another mental disorder, correct?

18   A    Correct.

19   Q    And you agree that delusions come and go and cannot be

20   predicted?

21   A    It really varies.  Some people have very stationary

22   delusions, some delusions change.  I would not say that

23   that's an accurate statement about delusions coming and

24   going.

25   Q    When you say stationary, do you mean they're delusional

*Miriam Kissin - Cross - Ms. Bianco*

1    all the time, 24 hours a day, seven days a week?

2    A    So, there are individuals that have specific delusional

3    beliefs that are always present.  That doesn't mean that they

4    are necessarily always thinking about them or might be

5    sharing them with an individual, but the belief that system,

6    that part of the delusional system is present.

7    Q    So, the delusion would be always present but they're not

8    speaking about it, is that what you're saying?

9    A    If I may give an example.  Someone might believe that

10   they are somebody famous, they might believe that they are a

11   famous individual, famous singer, where in fact all evidence

12   does not point to that, and so they may always believe that

13   that is true, that is their identity.  That is not true based

14   on sort of our shared understanding of the world, but they

15   may always feel that.  And if asked that, they will share

16   that or sometimes offer that if not asked, but they also can

17   go about their day, they can eat, they can sleep, they can

18   manage financial matters, but that belief is present.

19   Q    So, that belief would be part of their persona, the

20   delusion, correct?

21   A    Correct.

22   Q    There are also associated features that support a

23   diagnosis of delusional disorder, correct?

24   A    Well, if you may ask it specifically.

25   Q    According to the DSM there are associated features that

*Miriam Kissin - Cross - Ms. Bianco*                    19

1   support a diagnosis of delusional disorder, such as,

2   "Individuals with delusional disorder may be able to

3   factually describe that others view their beliefs as

4   irrational but are unable to accept this themselves."  Is

5   that what the DSM says about associated features with the

6   diagnosis?

7   A    That can happen, yes.  That is something that can happen

8   within individuals with delusional disorders.

9   Q    And individuals with delusional disorders, there may be

10  factual insight but not true insight, correct?

11  A    If that's characterizing your previous example, I would

12  agree with that, that someone might.

13  Q    Well, that's what the DSM says, is that right?

14  A    Yes.  It's basically speaking to what you just earlier

15  gave an example of.

16  Q    Another associated feature that supports the diagnosis

17  of delusional disorder is legal difficulties, correct?

18  A    That can occur, yes, certainly.

19  Q    Now, here Dennis was being treated for his delusions

20  with the medication Geodon.  You're familiar with that,

21  correct?

22  A    Geodon yes.

23  Q    And he received 80 milligrams twice her day, correct?

24  A    That is what it says, yes.

25  Q    And Geodon is an antipsychotic, correct?

1   A    Yes.

2   Q    And 80 milligrams twice a day is the maximum dose a

3   person can be on?

4   A    I don't know.  I'm not a physician, I'm not clear about

5   dosages, but if that's -- if that's the information that you

6   have, I don't have a reason to --

7   Q    You don't know one way or another?

8   A    I do not know.  I don't prescribe medication, I'm a

9   psychologist, so I'm not clear about the maximum dose of

10  Geodon.

11  Q    But Geodon is a prescription medication used to treat

12  the symptoms of schizophrenia, acute agitation with

13  schizophrenia, and bipolar 1 disorder, is that right?

14  A    It's an antipsychotic disorder that can be used for all

15  of those things, correct.

16              THE COURT:  Antipsychotic medication.

17              THE WITNESS:  Sorry, yes, it's an antipsychotic

18  medication used to treat all those disorders.

19  Q    And it can help decrease hallucinations, correct?

20  A    It can, yes.

21  Q    Obviously, you said you're not a medical doctor so you

22  didn't describe Geodon to Dennis?

23  A    Correct.

24  Q    So some psychiatrist in the Bureau of Prisons prescribed

25  that to Dennis?

*Miriam Kissin - Cross - Ms. Bianco*                          21

1  A    The psychiatrist at Devens prescribed that.

2  Q    And the Geodon has decreased the frequency and severity

3  of Dennis' behavioral and adjustment problems, correct?

4  A    Antipsychotics often alter behavioral disturbances as

5  well.

6        THE COURT:  The question is with respect to the

7  defendant here.

8  Q    Yes?

9  A    Yes.  And so that's just to clarify why an antipsychotic

10 might do that, yes, that does seem what happened with

11 Ms. Dennis and by her own account as well.

12 Q    And you have reviewed all the records and know that

13 Dennis is not always compliant with his medications, correct?

14 A    I believe that's been true in the past, yes.

15 Q    Okay.  So if he stopped taking the Geodon, his psychoses

16 or delusions could readily appear, correct?

17 A    I'm not -- again, I don't -- based on my evaluation and

18 my review, I am not clear that Ms. Dennis ever presented with

19 actual hallucinations or delusions.  I believe that she's

20 given relatively vague accounts of those things.  The most

21 prominent features have been more behavioral, and the Geodon

22 has again by record review, by my own observation, and by her

23 own account helped to manage some of those behavioral

24 problems that she's had consistently.

25 Q    Well, this wasn't the first time that she had been put

1   on an antipsychotic, correct?

2   A    Correct.

3   Q    She's been put on lots of antipsychotics in the past, is

4   that right?

5   A    That's correct.

6   Q    Let's talk about some of Dennis' delusions that are

7   documented in the medical records.  In December of 2020

8   Dennis claimed to be worth over $40 billion, is that right?

9   A    Yes.

10  Q    In December of 2020 Dennis claimed to be the leader of

11  the Latin Kings, which is a prison gang, correct?

12  A    Correct.

13  Q    And that's a delusion?

14  A    Well, it's a statement that she made that could be part

15  of someone's delusion.  I did not diagnoses it as a delusion,

16  but that she did make those statements, that's correct.

17  Q    So, she's making those statements and you don't know

18  whether she was delusional when she made them or not?

19  A    Well, she has indicated that she does not believe those

20  things to be true.

21  Q    Okay.  And she indicated each one of those statements

22  were not true to you?

23  A    Yes.

24  Q    Where in your report does it say that she said none of

25  those statements are true?  Can you tell us the page number?

*Miriam Kissin - Cross - Ms. Bianco*                    23

1    A    I'm not clear that I put it in my report.  I did say in

2    my report that she's provided inconsistent statements about

3    those things, and the inconsistency being not just to myself

4    but to other providers sometimes she has said those things

5    and other times she has not said that those things are true.

6    Q    Just to be clear, it's not in your report that she said

7    none of these things were true, correct?

8    A    She did not tell me that those are truth about her.  She

9    did not indicate to me that she is the leader of the Latin

10   Kings, nor that she is worth significant amounts of money.

11   Q    So, you got that information from records?

12   A    No, I got that information from her.

13   Q    So, she told you directly she was worth $40 billion?

14   A    She did not tell me that.

15   Q    You just said you got the information from her.

16   A    She did not tell me that she's worth $40 billion, nor

17   that she is the leader of the Latin Kings.  She did not say

18   that those things are true about her to me.  That's not part

19   of the history that she provided to me.  That was nowhere in

20   the information that she provided to me.  But I do see in the

21   records that she has provided that information to other

22   individuals.

23   Q    On December 14, 2020, Exhibit 4, Bureau of Prisons

24   records, that's where she provided that information to a

25   mental health provider at the Bureau of Prisons, correct?

*Miriam Kissin - Cross - Ms. Bianco*                24

1    A    Yes.

2    Q    She claimed to be a secret agent, correct?

3    A    I believe so, yes.

4    Q    She claimed to be a Navy SEAL?

5    A    Yes.

6    Q    And she also claimed to be a hermaphrodite, correct?

7    A    Well, it's complicated.  Ms. Nelson has a diagnosis.

8    Q    I'm asking you if she claimed to be a hermaphrodite.

9    A    I believe so.  I think that she refers to her diagnosis

10   as that.

11   Q    In December of 2020 she was confronted with the fact

12   that she has normal genitalia.  She claimed that she had

13   breast and internal female organs.  That was in December of

14   2020, Defendant's Exhibit 4, is that right?

15   A    Um, correct, she said that.

16   Q    She does not have internal female organs, is that right?

17   A    I do not know exactly about her internal.  I don't

18   believe that she has internal female organs but she does have

19   a sex chromosome disorder.

20   Q    But in terms of having internal female organs, if she

21   said she had internal female organs, that would be a

22   delusion, correct?

23   A    Well, that would be wrong, yes.

24   Q    Okay.  The medical professional that saw her on

25   December 20th said that she is inconsistent with these claims

1   and is felt to have no insight into her delusions.  And

2   that's Defendant's Exhibit 4.  Do you see that?

3   A      Uh-huh, yes, I do.

4   Q      Are you disagreeing that she has delusions at all?

5   A      I do not disagree that she makes statements that are not

6   factual, she makes them inconsistently and she often detracts

7   them later.

8   Q      My question to you is, are you saying that she does not

9   suffer from delusions?

10   A      I do not believe that this is part of a delusional

11   system.

12   Q      So, the psychiatrist who wrote this report, it would be

13   incorrect when he said she has no insight into her delusions?

14   A      That would be Dr. James Kennedy, our psychiatrist.  I do

15   not agree with that diagnosis, correct.

16   Q      But that is a diagnosis from a psychiatrist?

17   A      That is Dr. Kennedy's diagnosis.

18   Q      Okay.  Let's look at her behavior in the present

19   charges.  You reviewed her threat letters from August 1st,

20   2018, July 5th, 2019 and July 15, 2019, is that correct?

21   A      I reviewed the discovery for purposes of the competency

22   evaluation, correct.

23   Q      Showing you Defendant's Exhibit 12, this is where she

24   wrote a letter with a bomb threat to Judge McAvoy, correct?

25   A      That is the allegation, correct.

1   Q    And you reviewed that letter, correct?

2   A    Yes.  It was part of the discovery, correct.

3   Q    And she claimed to have a Muslim brotherhood who could

4   assist her in carrying out a bomb threat, correct?

5   A    That is what that says, yes, correct.

6   Q    That could be considered a delusion, right?

7   A    Again, this is part of the -- just if you will allow.

8   This was a competency evaluation, so I did not discuss with

9   Ms. Nelson issues related to her behavior in terms of the

10  allegations because this evaluation is particular for the

11  competency, so I don't want to go out of the lane of

12  competency and speak about -- speak about specifically

13  information that she may or may not have given me in terms of

14  behaviors associated with the alleged offense.

15  Q    Well, part of the test for competency is to determine if

16  the person suffers from a mental disease or defect, that's

17  the first part of the test, correct?

18  A    Yes, correct.

19  Q    Okay.  And determining whether she has a mental disease

20  or defect, is it your opinion that she does not suffer from a

21  mental disease or defect?

22  A    My opinion is that she suffers from personality

23  disorders.

24  Q    And not delusional disorders?

25  A    That is correct.

*Miriam Kissin - Cross - Ms. Bianco*

1  Q    Let's look at the evidence to see if she's suffering

2  from delusional disorders in the records that you reviewed,

3  okay?

4  A    Correct.

5  Q    So we're going back to the letter to Judge McAvoy where

6  she claimed to have a Muslim brotherhood who could assist her

7  in carrying out a bomb threat.  Do you see that?

8  A    Yes.  That's in front of me, yes.

9  Q    And she signed it ISIS Rules, correct?

10  A    Again, this is part of the discovery information and,

11  yes, I'm looking at that.  I don't think that I could speak

12  to Ms. Nelson's actions in regard to this letter.

13  Q    I'm asking you whether a person, we'll do it

14  hypothetically then, a person who wrote a letter like this

15  who says they have a Muslim brotherhood who could assist her

16  in carrying out a bomb threat, signs it ISIS Rules, and the

17  envelope is with her own name it on the return address, is

18  hypothetically speaking a person who wrote a letter like

19  this, could they be considered delusional?

20  A    Well, again hypothetically there could be lots of

21  reasons for it.  One could be that the person may in fact be

22  part of ISIS.  Another one might be that they're trying to be

23  provocative and frightening in their communications, in which

24  case some reference being part of a terrorist group might

25  certainly accomplish that.  Another might be that there might

1   some delusional component to it.  So there could be multiple

2   reasons why someone might write that letter.

3   Q    But one of them could be they're suffering from a

4   delusion, correct?

5   A    It could be, yes.

6   Q    I would like to show you Exhibit 13, a letter sent

7   7/5/19, from jail to Senator Schumer with a bomb threat.

8   Hypothetically speaking, if a person wrote this letter

9   claiming to be part of ISIS, signed it ISIS Rules, that

10  person could they possibly be suffering from delusions?

11  A    I would say it would be the same possibilities as

12  before.  So, if it is a letter that is intended to strike

13  fear or terror in the recipient, certainly associating

14  oneself with a known terrorist group, that could be

15  motivation.  Again it could be from someone who is actually a

16  believer of ISIS or the philosophy.  And theoretically could

17  also be from an individual that might be motivated solely by

18  perhaps some delusional ideas.  So all of those things can be

19  the case.

20  Q    And you said that you didn't really talk to her about

21  the letters she wrote, that would be outside of your lane, is

22  that right?

23  A    That's not exactly what I said.  So, for to do a

24  competency evaluation, the most important issue is whether

25  the individual understands the allegations that the

1  government is making against them, not whether or not they

2  did or did not do the action that's alleged.  And so I did

3  speak to Ms. Nelson specifically about the letters that she

4  allegedly --

5  Q    So you did talk about the letters, yes or no?

6  A    Yes.  They're part of the discovery and the allegations,

7  correct, that is the crux of the allegations against her.

8  But what she said about the letters and anything potentially

9  incriminating would certainly not be something that I would

10 include in a competency evaluation or testify to because, you

11 know, as I provided my informed consent, that there is, as

12 you know, a firewall between those issues of competency and

13 actual incriminating information.

14 Q    Are you saying that you wouldn't write anything

15 incriminating about the letters in your report?  Is that what

16 you're saying?

17 A    The competency evaluation is not --

18 Q    That's a yes or no question.

19 A    I am not meant to.

20 Q    Let's talk about that same letter, okay.  You talked to

21 her about that letter.  And I'm going to refer you to page 8

22 of your competency report on Exhibit 10.

23 A    Yes.

24 Q    Do you see where she says, you write I think, in 1990 --

25 excuse me, "In 2019 that I threatened Chuck Schumer, that I

1    sent powder in a letter, a bomb threat, that'll blow him to

2    pieces."  You wrote that, didn't you?

3    A    Well, that sentence starts with the DA said I made, and

4    those are excerpts from.  So I'm asking her what is the

5    allegation.

6    Q    So, the allegation that she's claiming is that she had

7    powder in the letter, correct?

8    A    That is one of the things, yes.

9    Q    Okay.  And you reviewed that actual letter and there is

10   no reference at all about any powder being there, correct?

11   A    Well, the letter doesn't have powder.  I don't know if

12   there was powder in the letter.

13   Q    Exhibit 10 -- Exhibit 13, please.  Is there any

14   reference that there is powder in the letter?

15   A    Ms. Nelson did not tell me she referenced powder, she

16   said that she put powder in the letter.

17   Q    You were just saying that the DA, she was only talking

18   about what the DA told her, correct?

19   A    She told me what the allegations against her are, and so

20   she added besides writing a letter, she said that there was

21   also an allegation of there being a powder, or she believed

22   there was an allegation of powder.  Whether or not in fact

23   there was powder found I'm not aware of.  But she did not say

24   that she wrote a letter saying that there was powder.  Just

25   maybe I wasn't clear.  She said that there is an allegation

1    that she put powder in the letter.  Again, I don't know if

2    powder was found.

3    Q    So, if that allegation about powder in a letter was not

4    true, she doesn't have a complete factual understanding of

5    this particular charge with this letter, correct?

6    A    Well, I guess that particular piece that there was

7    powder was something that she believed might be part of the

8    charge, but I'm not aware of --

9              THE COURT:  Let her finish.

10   Q    Sorry.

11   A    She believed that there was a piece of a charge -- she

12   was able to talk about what the charges were and she added a

13   piece, which was the powder, that I don't see in the actual

14   allegations against her.  So it wasn't incomplete, it was an

15   additional piece that was not actually there.

16   Q    So, if it's not at all true, hypothetically speaking,

17   that there is no powder in that letter, that she doesn't

18   truly understand what she's being accused of, is that right?

19   A    I believe that she thinks that there might be more that

20   she's accused of than she actually is, but she does

21   understand everything that she is being accused of

22   accurately.  She also added an additional accusation in

23   addition to the ones that are true that may not be part of an

24   actual charge.

25   Q    So, that would be an inaccurate assessment of the

1   charge, yes or no?

2   A    No.

3   Q    So, if there was no powder in the letter and she's

4   telling you that she's being accused of sending powder in a

5   letter to Senator Schumer, would that be inaccurate?

6   A    I think it's semantics.  I think she understands the

7   charges.  She's wrong about that additional piece and I

8   believe that that would not detract from her understanding of

9   what the actual charges are.

10  Q    Okay.  So, she's making up additional facts, that could

11  be what's happening, correct?

12  A    She may be confused.  She might have wrong information.

13  I am not sure but she -- all the charges that are in fact

14  true she was able to discuss.

15  Q    Okay.  But adding additional facts could be part of a

16  delusion, correct?  That she's ISIS, that she's going to blow

17  people up, that could be part of a delusion, correct?

18  A    She did not tell me that she's ISIS.

19  Q    I'm talking about the letter.  When she's writing in a

20  letter, hypothetically if she wrote this letter, and she is

21  saying that she is ISIS, ISIS Rules, and that she's going to

22  cut someone up in a million pieces and your whole family is

23  going to die, could that be a delusion, yes or no?

24  A    Again, it could be one of several things, including

25  meaning to terrorize, threaten and scare.

*Miriam Kissin - Cross - Ms. Bianco*                                    33

1   Q     I understand what you said.  I'm asking if one of those

2   several things -- could it be one of those possibilities that

3   she's delusional?

4   A     That is one of the possibilities.

5              THE COURT:  I think we covered that.

6   Q     Exhibit 14, please.  On July 15, 2019, she sent a letter

7   from jail to Congressman Brindisi.  You reviewed that letter?

8   A     I did.

9   Q     Where she's threatening to blow him up and she signs it

10  ISIS?

11  A     That is what I reviewed, yes.

12  Q     And this is yet another example where it could be one of

13  several things but could be a delusion, yes?

14  A     Yes.

15  Q     Okay.  And she talked to you about what she was feeling

16  at the time that she sent these letters, is that right?  And

17  I'm going to show you Exhibit 10, which is the addendum on

18  page --

19             MR. EURENIUS:  Objection, Your Honor.  The

20  government -- I let the defense go.

21             THE COURT:  Okay.  The addendum is as to a

22  different issue, correct?

23             MS. BIANCO:  The addendum is a different issue but

24  she talked about her psychiatric treatment at the time of the

25  offense, that she didn't feel her medications were effective

1    and that she was bugging out.

2              THE COURT:  You can ask her about information she

3    had at the time she made the competency evaluation.

4    Q    Did she tell you at the time she wrote those letters in

5    that time frame, the time frame she was receiving psychiatric

6    treatment, she did not feel her medications were effective,

7    the meds weren't helping me, I was bugging out, banging on

8    the windows, irritating the neighbors?  She said that,

9    correct?

10             THE WITNESS:  Your Honor, if I may address the

11   Court?

12             THE COURT:  Did she say that to you at the time you

13   were evaluating her for competency?

14             THE WITNESS:  No, that was not during the time I

15   was evaluating her for competency.

16   Q    That was during the time of your evaluation as a whole,

17   correct?

18   A    That was the time during my evaluation of her sanity.

19   That addendum that you're referring to is regarding to sanity

20   at the time of the offense.  Those are two different

21   evaluations.

22             THE COURT:  When did she make those statements to

23   you?  Chronologically when did she make those statements to

24   you?

25             THE WITNESS:  Specifically when I was evaluating

1  her regarding the sanity issue, which certainly would bring

2  in incriminating information.

3           THE COURT:  Month and year.

4           THE WITNESS:  It was probably days between the two.

5  It was all around the same time.  It wasn't a separate

6  evaluation, it was while she was at Devens.

7  Q    She told you at the time she was writing these letters

8  her medication wasn't working and she was bugging out, yes?

9  A    She did not --

10 Q    It's in your report.

11          THE COURT:  Let her answer.

12 A    I understand.  I just, I want to be helpful and I want

13 to answer, I just want to clarify that there were two

14 separate evaluations, and Ms. Nelson was given information

15 that the evaluation for her sanity is relevant to --

16          THE COURT:  I'm not interested in anybody else's

17 assessment about --

18          THE WITNESS:  No, this is what I said to her.

19          THE COURT:  Pardon?

20          THE WITNESS:  It is what I said to her, not what

21 Ms. Nelson said to me.  So this was not in the course of my

22 evaluation of her.

23          THE COURT:  Okay, fine.  I get that, you evaluated

24 her for competency, you evaluated her for sanity.  The

25 question is, at the time of those evaluations, which were

1    done within a short period of time, right?

2                THE WITNESS:  Correct.

3                THE COURT:  One within days of each other.  Did

4    Ms. Nelson make the statements that Ms. Bianco has identified

5    to you?  I understand you reflected them in a different

6    report.  Did she make those statements to you?

7                THE WITNESS:  She did make statements that that was

8    something that was going on when she was in the jail in

9    New York, yes.

10               THE COURT:  Thank you.

11   Q    So, when she's telling you she's bugging out and the

12   medications weren't working, at the time she's writing these

13   letters, could she be considered delusional?

14   A    Um, not -- that could be one of multiple possibilities.

15   So, the medications that she takes typically manage her

16   behavioral issues, and so when she's not on medication, she

17   is much more provocative, she engages in self-harming

18   behaviors, she engages in a lot of oppositional behaviors

19   with staff, she can be -- and so when she's not on those

20   medications, all of those things can be true and maybe what

21   was going on at that time.

22   Q    Well, when you were interviewing her about the letters,

23   didn't she tell you that the correctional officers were

24   telling her to write these letters and they were paying her

25   with books and magazines?  Didn't she say that?

*Miriam Kissin - Cross - Ms. Bianco*

1  A    She said that the correctional officers in the New York

2  State prison where she was were toying with her, that they

3  knew her history of writing letters and they were taunting

4  her about writing letters, telling her that it was okay to

5  write to Democrats rather than Republicans, and that they all

6  were familiar with her history and egging her on to write

7  letters.

8  Q    And she told you they were paying her with books and

9  magazines, correct?

10  A    Yes.  They said that she got extra materials, I believe

11  it was books and magazines.

12  Q    Could that be considered a delusion, that she believes

13  people are paying her to write threatening letters?

14  A    Again, I was not privy to that, but certainly those

15  would be things that officers would have access to in the

16  facility, so books and magazines are a type of currency in

17  the prison system and that could be -- it could be something

18  that could have been done.  I'm not privy to that.

19  Q    So, you think there is a possibility that the

20  correctional officers were paying her in books and magazines

21  and this wasn't a delusion, so she could write threatening

22  letters to various people, is that what your honest opinion

23  is?

24  A    Well, she made multiple statements about her rationale

25  or her motivation for and that was one of them.

1    Q    Let's talk about a little bit about her delusions.  They

2    go back for years and years.  Showing you Mohawk Valley

3    psychiatric records, Exhibit 1, please.  This is 8/18/92,

4    "Patient has become more angry and violent with development

5    of more bizarre behaviors, including running out into the

6    road and standing and swearing for hours at a time, making

7    faces at the windows of neighbors' houses."  Do you see that?

8    A    Yes.

9    Q    So, you would agree that those -- she has a history of

10   delusions that go back many years?

11   A    So, I'm not sure about the delusional aspect of this

12   particular statement you gave me, but that does seem to

13   certainly speak to, you know, mental health problems and it

14   could certainly be unusual bizarre behaviors, yes.  I'm not

15   sure what the delusional piece of that is but is unusual

16   behavior and could be part of --

17   Q    Are you ruling out delusions?  That that is not a

18   delusion, is that what you're saying?

19   A    I guess I'm not sure which part of that is delusional.

20   Q    Running into the road, standing and swearing for hours

21   at a time, making faces at the windows of neighbors' houses,

22   that wouldn't be any kind of delusional behavior or

23   consistent with delusional behavior?

24   A    Delusion is a belief that's false.  I'm not sure what

25   false belief that that speaks to.  Again, there might have

1   been a false belief associated with that, but that seems that

2   it's problematic behavior that could be associated with a

3   number of things.  I guess I'm just not sure what you mean by

4   delusional.

5   Q    I'll get to more specific examples.  She claimed to have

6   two husbands who were doctors she met in the hospital.

7   That's a delusion, correct?

8   A    So, that is a statement that she made to me.

9   Q    A delusion?

10  A    No.  Because when I pushed her on that further, she

11  said, well, in fact they were not husbands, they were

12  actually people that she liked and that were nice to her, and

13  that ultimately told me that she didn't really know them very

14  well.

15  Q    But she told you initially that she has two husbands who

16  are doctors who she met at the hospital, right?  She said

17  that?

18  A    She did say that.

19  Q    Okay.  She claimed to have seen faces in the walls and

20  heard her name called while at Strong Hospital, correct?

21  A    She did say that to me, yes.

22  Q    And that would be considered a delusion?

23  A    No.  That would be a visual hallucination or an auditory

24  hallucination.

25  Q    That's not a delusion?

1    A    It is not.

2    Q    And a visual or auditory hallucination, would you

3    consider that a mental illness, mental defect?

4    A    That could be a symptom of mental illness, yes.

5    Q    Well, in August of 2021, didn't she cut her neck with a

6    razor because she believed the staff were playing games with

7    her when she was placed in quarantine for COVID-19?

8    A    She did.  Yes, she did.

9    Q    That would be delusional behavior, correct, cutting her

10   own throat?

11   A    No, it was not delusional.  That was not based on

12   delusional.  That was consistent with a lot of behaviors that

13   she had in terms of self-harming behaviors when she's unhappy

14   about situational issues, at that point it was quarantine and

15   isolation, which she did not feel was fair.

16   Q    She said that she thought they were playing games with

17   her by placing her on quarantine for COVID, yes?

18   A    Yes.  She did not think she should have been on

19   quarantine for COVID.

20   Q    And then she tried to slit her own throat?

21   A    Correct.

22   Q    She also claimed to be picked on by cellmates and others

23   in her unit, and none of this was actually observed by staff,

24   correct?

25   A    Yes.  I believe she did say that, yes.

*Miriam Kissin - Cross - Ms. Bianco*                    41

1  Q    Okay.  So, if she believes she's being picked on by all

2  these different people and nobody's observing it, that would

3  be a potential delusion, correct?

4  A    No, not necessarily.  She has a history of poor

5  interpersonal interactions with peers that goes back a long

6  time.  This is not part of a delusional system.  She often

7  feels that people are against her or in some way mistreating

8  her or not treating her as fairly as other people.

9  Q    So, she feels like she's being persecuted?

10  A    She feels like that's being picked on, yes.

11  Q    And if it's not true and she has this honest belief that

12  all of these people are picking on her, that could be a

13  delusion, yes or no?

14  A    That's not typically a delusional behavior.  That's more

15  consistent with personality disorder.

16  Q    But it could be a delusion, yes?

17  A    Not in that particular example that you gave, no, I

18  would not conceptualize that as delusional.

19  Q    She claimed to have chased a teacher around with a

20  machete in elementary school.  Do you remember her saying

21  that?

22  A    Yes.

23  Q    And did you determine whether or not that actually

24  happened by the school records?

25  A    I don't have school records at that point, I don't know

1  whether that happened or not.

2  Q    So, if she believes she was chasing someone, a teacher,

3  around with a machete in elementary school and that didn't

4  happen, could that be a delusion?

5  A    It could be a provocative statement, it could be a lie.

6  Ms. Nelson makes many statements that are not truthful.

7  Q    Could it be a delusion, yes or no?

8  A    I don't think that that's consistent with delusion.

9  Q    So, without a doubt, 100 percent certainty it is not a

10 delusion, is that what you're saying?

11 A    So, a delusion is a belief that has some kind of core,

12 some type of -- it's not sort of a mixture of a variety of

13 untruths or lies.  A delusion is a system and that's what we

14 conceptualize as a delusion, has a specific goal or slant.

15 And multiple untruths about one's background, one's history,

16 childhood, other parts of history, would not be

17 conceptualized as a delusion.  Certainly there may be other

18 reasons why someone might not provide accurate information,

19 or straight up lie, or perhaps have other motivation why they

20 might say that.

21      A delusion generally has a specific core to it, a belief

22 that everything stems from.  So again, if someone believes

23 that they are famous when in fact they are not, they might

24 act in certain ways, believe that they should have certain

25 privileges, that they believe that they should be respected

1    and they're not.  But if that same person says something

2    that's not true about their childhood, that has nothing to do

3    with that particular issue, we would not sort of

4    conceptualize that as delusional, we would say that's a lie,

5    but this other piece is the delusional.

6    Q    Let me just see if I understand this.  For example, if

7    someone was claiming they're Osama bin Laden, that would be a

8    delusion?

9    A    If they are not in fact Osama bin Laden.  Again, if

10   they're writing a letter to try to terrorize someone, make

11   them believe that Osama bin Laden is after them, I would say

12   not.  If they in fact believe that they are Osama bin Laden

13   and that is their actual belief, then I would say that's

14   delusional, not consistent with reality.  So a lie is not the

15   same thing as a delusion.  A provocative statement is not the

16   same thing as a delusion.

17   Q    Okay.  It's not the same thing, but if someone said and

18   they honestly believed that they are Osama bin Laden and

19   they're not, that's delusional?

20   A    Yes, I would say that's delusional, yes.

21   Q    If someone believes they're part of ISIS and part of a

22   Muslim brotherhood, that would be delusional if they're not

23   in ISIS or part of the Muslim brotherhood, correct?

24   A    Yes.  If that's part of their belief system, yes.

25   Q    You said that Dennis, you believe that he was an

*Miriam Kissin - Cross - Ms. Bianco*                    44

1    accurate reporter earlier on, correct?

2    A    I said that there is some inconsistencies but that

3    his -- that I would not describe him necessarily as, I'm not

4    sure, you used a word that I think that it was inaccurate,

5    that was fully inaccurate.  That there was some

6    inconsistencies so I think he is an inconsistent reporter to

7    me.

8    Q    And someone who is working with a defense lawyer who is

9    trying to mount a defense, they need to get facts from the

10   client, correct?

11   A    About the charges and the issues related with the

12   charges, certainly, yes.

13   Q    And the facts should be -- they should have the

14   capability of being truthful, correct, truthful facts telling

15   their lawyer?

16   A    One would hope that one would tell their lawyer truthful

17   facts, yes.

18          THE COURT:  The question is they should have the

19   capability of telling truthful facts.

20   A    Sure, yes.  They should have the capability, yes.

21   Q    Okay.  And you said that she had some inconsistencies

22   with her reporting in the past.  But let me direct your

23   attention to the statement you made in your report on page 3,

24   "She claimed that her mother drove a car loaded with she and

25   her siblings into the river," do you see that?

1   A    I do, yes.

2   Q    So do you know if that actually happened to Dennis?

3   A    I do not know that.

4   Q    So you don't know if that's fantasy or reality, correct?

5   A    I don't know if it's a lie, if it's reality, or if it's

6   fantasy, I don't actually have that information.

7   Q    And if she honestly believes that her mother drove her

8   and her siblings in a car into the river and she believes

9   that to be true, would that be a delusion?

10  A    Again, if it's not part of a delusional system that's

11  related to delusional disorder, I'm not -- it's not

12  necessarily a delusion.  It could be a lie.  It could be an

13  inaccurate memory.  It can be for someone who has an entire

14  delusion around their childhood about events that never took

15  place and that informs their understanding of their world, it

16  could be part of the delusional system, but this particular

17  issue I cannot say because I don't know if it actually

18  happened and that's not -- that's not part of her functioning

19  at this point, so I don't know that that's a part of a

20  delusional system.

21  Q    What if a person thinks they can contact other people

22  through their dreams, would that be delusional?

23  A    Again, a delusion is part of a delusional system, so I

24  would have to know more about the individual.  People have

25  beliefs esoteric and, you know, in the abstract I really

*Miriam Kissin - Cross - Ms. Bianco*                    46

1  can't say without knowing more about the individual that this

2  is someone with a delusional disorder and that it part of it.

3  Perhaps it can be, but in isolation I really cannot give a

4  diagnosis just based on that one piece of information.

5  Q    Exhibit 5, BOP records 2/24/21, Dennis tells the mental

6  health provider, "I talk to myself and answer the questions

7  thinking about David Morse.  He is a medical doctor that

8  understands me from AZ.  He is in the trauma center.  I

9  contact him through my dreams."  Do you see that?

10 A    Uh-huh, yes.

11 Q    Could that be delusional?

12 A    Well, in that particular case he was actually talking

13 about knowing that this information is coming from his own

14 head separate from the dreams part, so I don't believe that

15 he is talking about any kind of auditory hallucinations.  He

16 is saying these are his own thoughts in terms of contacting

17 him through his dreams.  Again, I don't think this is part of

18 a delusional system.  People believe various things.  I do

19 not see this as part of a comprehensive delusional system for

20 Ms. Nelson.

21 Q    Do you consider it a mental illness when someone thinks

22 that they can contact people through their dreams and have

23 conversations?  Is that a problem?

24 A    Again I don't know if it's a problem.  I believe that

25 Ms. Nelson has beliefs that are unusual and that are not

*Miriam Kissin - Cross - Ms. Bianco*                        47

1  necessarily reality based.  They change from day-to-day.

2  Sometimes she thinks these things, other times she thinks

3  that that is not the case.  She also makes statements that

4  she retracts, that is not consistent with a delusional

5  disorder where it tends to be consistent, the belief doesn't

6  really change over time unless it's -- unless there is

7  treatment given.  Delusional disorders don't usually respond

8  to treatment very well at all.  In fact, medications don't

9  usually help with delusional disorders, it's one of those

10 very difficult to treat, they have a lot of staying power and

11 remain consistent.  And so various statements that are, you

12 know, unusual are not typically what delusional disorders

13 look like.

14 Q    You just said that her reality may change from

15 day-to-day?

16 A    I said her statements change from day-to-day.

17 Q    And her statements deal with her reality.  Like, for

18 example, she's contacting people through her dreams, that

19 would be an irrational thought, is that right?

20 A    Or it could be a provocative statement which Ms. Nelson

21 often makes.  Again, that's not how delusional disorder

22 manifests.  It is not sort of a hodgepodge of various odd

23 beliefs that come and go over time, that's not consistent

24 with delusional disorder.

25 Q    But her odd beliefs that come and go from various times,

*Miriam Kissin - Cross - Ms. Bianco*                              48

1  that could interfere with an attorney-client relationship in

2  trying to put on a defense, can't it?

3  A    If it's related to the defense, to the content of the

4  charges, certainly.  So people with delusional disorders can

5  certainly be competent and can participate in the legal

6  process, and that happened lots of times, including my own

7  experience.  However, if that delusional disorder, the issues

8  relate that the delusion is about are specifically related to

9  the charges or perhaps to the attorney themselves, they might

10 have some false beliefs about the attorney or have a belief

11 that the issue is something other than the charge that they

12 want to bring forth to highlight these delusions, that

13 certainly can interfere with competency and one's ability to

14 participate in the legal process, yes.

15 Q    Thank you.  Now, Dennis has described having auditory

16 and visual hallucinations in the past, is that right?

17 A    Yes.

18 Q    And the records reflect as early as August of 1995

19 Dennis reported hearing voices for at least three years.  Are

20 you familiar with that record from Mohawk Valley Psychiatric

21 Center, Exhibit 6?

22 A    Again, there were five or six inches of records.  I did

23 review most or all of the mental health records.  I'm sure

24 that that was one that I reviewed, that seems consistent with

25 what I reviewed.

1  Q    So for many, many years she has claimed to have auditory

2  and visual hallucinations, correct?

3  A    Yes.

4  Q    Yes?

5  A    Yes.

6  Q    Okay.  And as late as January 1st, 2021, Exhibit 7,

7  please, she reports hearing and seeing things that others do

8  not?

9  A    Yes.

10 Q    And that could interfere with her ability to relate with

11 her lawyer in terms of putting on a defense if she's hearing

12 and seeing things that aren't there, yes?

13 A    So, a history of seeing and hearing things would not

14 necessarily interfere.  If those things are happening in the

15 moment and they are -- they may certainly interfere with the

16 communication if the person isn't able to be oriented to

17 their present experience.  But a history of having those

18 things if they're not currently going on would not

19 necessarily interfere.

20 Q    But if she has a history of them for going on twenty

21 years, if she's suffering from some kind of an auditory or

22 visual hallucination at the time she's speaking with her

23 lawyer, you would agree that that would interfere with the

24 ability to put on a defense, yes?

25 A    So, the history would be the symptoms, if they were

1   active symptoms present at the time that the individual is

2   interacting with their lawyer and those things are -- those

3   things are prominent and interfering with the conversation,

4   then certainly that would be something that could interfere,

5   yes.

6   Q    Okay.  And you know that Dennis has a history of hurting

7   herself, correct?

8   A    Yes.

9   Q    She's cut herself, yes?

10  A    Yes.

11  Q    Bit herself?

12  A    Yes.

13  Q    Burned herself?

14  A    Yes.

15  Q    Rubbed feces on open cuts?

16  A    Yes.

17  Q    Swallowed foreign objects?

18  A    Yes.

19  Q    Hurt herself to the point where she needed surgery?

20  A    Yes.

21  Q    And she was committed multiple times to Central New York

22  Psychiatric Center in the past, correct?

23  A    Yes.

24  Q    And that's for things like swallowing a spork?

25  A    Yeah.  I believe that she's done that several times,

*Miriam Kissin - Cross - Ms. Bianco*

1   yes.

2   Q    And then she rips out her surgical staples and swallows

3   them?

4   A    Yes.

5   Q    And she's continued those self-abusive behaviors

6   throughout her years?

7   A    She has a long history of that, yes.

8   Q    She doesn't seem to want to help herself?

9   A    I'm not sure that I agree with that, that statement.

10  Q    Let me be clear then.  5/8/21, Exhibit 9, she signs a

11  medical treatment refusal which states, "The consequences of

12  refusing this recommended treatment could include worsening

13  of medical condition and possibly death."  Do you see that?

14  A    Um, so that is not -- yes, I do see that, but that's not

15  related to what you were just talking about in terms of when

16  she has injuries that she's refused.  I believe that there is

17  another underlying medical condition which she has, which are

18  acceptance of treatment has at times been inconsistent for.

19  That's not a self-harming issue so I'm just not associating

20  those two things.

21  Q    Would you agree she has evidence of an irrational

22  thought process?

23  A    In terms of this?

24  Q    In terms of her history and the things she says and

25  does, she shows evidence of an irrational thought process?

1   A    There has been consistent with borderline personality

2   disorder, she has engaged in thinking and behaviors that are

3   irrational, absolutely, yes.

4   Q    Would you agree that her behavior may be the result of

5   faulty understanding?

6   A    I guess which behavior are you talking about?

7   Q    I'm talking about her writing letters, swallowing

8   sporks, having auditory and visual hallucinations.  Her

9   behavior as a whole could result from having a faulty

10  understanding of what's actually going on around her?

11  A    So, those are very different issues that you bring up.

12  So, in terms of swallowing sporks, cutting herself, doing

13  those things, those are long-standing problems that she's had

14  and those are usually associated with some dissatisfaction in

15  her circumstance, or in a relationship, or wanting a change

16  in conditions, and she's consistently voiced that after the

17  fact.  Those type of behaviors are very consistent with

18  borderline personality disorder.  And so I would qualify

19  that, the motivations for those as different, because you

20  kind of put a few things together, than writing letters.

21  Q    Let me break up my question, all right.  You said that

22  she may have relationship issues or problems so she'll hurt

23  herself, correct?

24  A    Well, I would say more than a relationship issue.  And,

25  yes, it's -- yes.  The fundamental thing is having a poor

1    ability to advocate for herself and being able to ask for her

2    needs being met, which is kind of part and parcel of a

3    personality disorder, specifically borderline personality

4    disorder.  So these individuals engage in sometimes very

5    dramatic and maladaptive, so self-harming behaviors, in order

6    to either express their distress or get their needs met.

7    Q    So it's a faulty, her faulty understanding of the

8    situation that causes her to self destruct, yes?

9    A    It's not a faulty understanding of the situation.  It's

10   a maladaptive, it's poor capacity to be able to basically

11   function interpersonally and socially, so be able to

12   negotiate with other people, to be able to engage with other

13   people and keep their assessment of whether that person's

14   helpful or unhelpful steady over time.

15   Q    Well, you're aware that she's literally wrote dozens and

16   dozens of threatening letters in the past that she's been

17   charged for, correct?

18   A    Yes.

19   Q    And let's talk about some of those letters.  Exhibit 15,

20   Count Three, please, date 12/15/01 to 12/17/01, writing to

21   the Federal District Court in the Western District of

22   New York.  It's a bomb threat letter to Judge Feldman, "Ten

23   days until you die and die."  And then she has this figure

24   360, 360,000.00 million dollars.  She wants apparently the

25   money sent to the jail.  She's threatening to burn the

1  judge's house down, find the parents and kill them.  Okay.

2  You see that, correct?

3  A     Yes.  I see this exhibit in front of me, yes.

4  Q     And when somebody makes up these numbers, these huge

5  amounts of numbers and thinks people are going to send them

6  money in the jail, that could be considered a delusion, yes?

7  A     Again, the motivation for this particular letter I do

8  not know; it can be to terrorize, it can be to be

9  provocative, it can be out of anger with the individual they

10  might have anger about from previous interactions with this

11  person.  I don't know Ms. Nelson's thought process, whether

12  she believed that that would in fact happen, whether she

13  thought that was realistic.  It's really impossible for me to

14  be able to speak to her thought process related to that

15  particular letter.

16  Q     Are you ruling out that this could be delusional

17  behavior?  Are you ruling that out, yes or no?

18  A     I did not assess her for her sanity at the time of these

19  letters, so I cannot say.  On the face of it, I think there

20  is lots of other explanations, but I also was not party to

21  assess her in 2001, so I don't know what her mental status at

22  that time was.  I don't believe that there was a sanity

23  evaluation.  I'm not sure if this is the one where she was

24  found competent, but I'm not sure whether there was a sanity

25  evaluation.

*Miriam Kissin - Cross - Ms. Bianco*                    55

1   Q     You already testified here that you don't think she

2   suffers from delusional disorder, correct?

3   A     At this moment, correct, that's not a diagnosis that I

4   would give to her at this point, I do not see symptoms of a

5   delusional disorder.  It's certainly possible that at some

6   previous time there might have been some thought processes

7   associated with a delusional disorder.  She has had a variety

8   of diagnoses over time.  My best conceptualization is that is

9   all part of personality disorder, but I also cannot rule out

10  behaviors that were previous to my time with her or recently

11  right before my time with her.

12  Q     And maybe I'm not hearing you correctly.  Yes or no, are

13  you ruling out the possibility that she has suffered from

14  delusional disorder for a number of years?  Are you ruling

15  that out?

16  A     Ever in her life, I cannot rule that out.  I cannot rule

17  out things that might have happened in the past, no.  I'm not

18  in the position to do that.

19  Q     Well, we talked a little bit about if she believed that

20  she was Osama bin Laden or ISIS, that would clearly be

21  something that could be a delusional disorder, correct?

22  A     If that's something that she believes -- if that is

23  something that is a belief she has right now, and I certainly

24  don't have any reason to believe that is true, then I would

25  say that that could be one of the explanations for why she's

*Miriam Kissin - Cross - Ms. Bianco*                    56

1   making this statement.

2   Q    When you reviewed the prior threat letters, there are a

3   number of letters where she signs them Osama bin Laden,

4   correct?

5   A    Talking about the ones related to this case or a

6   previous case?

7   Q    No, the past cases.

8   A    I believe so.  I believe there were some.  I did not

9   review those as carefully as the ones in this particular case

10  but I believe there were some that were, at least one I can

11  think of that were signed that.

12              MS. BIANCO:  May I have a moment, Your Honor?

13              (Pause in proceedings.)

14  Q    Her fascination -- well, would you agree that she was

15  very fixated on ISIS and Osama bin Laden?  Would you agree

16  with that?

17  A    She did not bring up ISIS or Osama bin Laden at any

18  point in the course of her evaluation other than when I was

19  discussing those letters related to the sanity evaluation.

20  That was not part of her thought process or her engagement

21  with myself, you know, or her provider because she was

22  designated as an inmate at Devens so she had a mental health

23  provider as well.

24  Q    If a person would for years write letters and claim to

25  be Osama bin Laden, would that be somebody that you might

*Miriam Kissin – Cross – Ms. Bianco*

1  consider to have a delusional disorder?

2  A    If the only time that that issue came up with that

3  statement or self identification as such would come up during

4  those letters, then I would say that that in fact is evidence

5  that that would not be part of a delusional disorder, but

6  rather something having to do with the letters themselves.

7  And someone who has a delusional disorder, that is something

8  that they share, that is a core belief about themselves when

9  they're writing letters, when they're eating, when they're

10  talking, it's something that is part of them, so that would

11  certainly come up at some other time.  That did not.

12  Q    It did not come up during your evaluation, but you do

13  not know how often it came up with her through her history of

14  incarceration, correct?  Is that fair?

15  A    Prior to BOP, yes.  I do have records starting from when

16  she was transferred to BOP and I was able to engage with her

17  providers and staff at Devens.  Prior to that, other than

18  letters, I'm not aware that that was something that was at

19  Devens.  But I don't know as much as I do about Devens,

20  certainly.

21  Q    If a person believed that they could turn on a bomb from

22  their jail cell, would you consider that a delusion?

23  A    If that is an actual belief that they have, I would say

24  that's not consistent with reality.  So again, it could be

25  part of a delusion, it could be part of an intention to

*Miriam Kissin - Cross - Ms. Bianco*                    58

1  frighten someone, that someone can cause harm.  There could
2  be a lot of explanations, but if in fact that is a belief
3  that the individual has, I would say that that's not
4  consistent with reality.
5  Q    Okay.  So showing you Exhibit 16, Count Six, 11/16/01,
6  do you see on the very bottom where it says, "This is no
7  joke.  If you try to do anything the bomb will go off.  I
8  will turn it on from my cell.  Signed Dennis T Nelson."
9  Correct?
10 A    I believe this is related to that same charge 2001,
11 those letters.
12 Q    That's right?
13 A    Yes, I do see that.
14 Q    So, if she's saying she can turn on a bomb from her cell
15 and actually believes that, could that be a delusion?
16 A    If that is something that she believes, she or anyone
17 believes, that I would say is not consistent with reality
18 that I'm aware of.
19 Q    Would you think it's consistent with reality for a
20 person to send threatening letters from a jail with their
21 name on it asking people to send millions of dollars to the
22 jail?  Is that consistent with reality?
23 A    Well, I believe that was reality.  That was what she was
24 charged with doing.
25 Q    I'm asking you if her belief that she's going to get

*Miriam Kissin - Cross - Ms. Bianco*                     59

1   millions of dollars sent to her in the jail by writing

2   threatening letters, is that consistent with reality?  People

3   are going to send her millions of dollars in the jail from

4   writing threatening letters?

5   A    Again, are you asking me sort of as an individual do I

6   think it's more likely than not to happen?  I think that's

7   probably not likely to happen.  That might just be a fantasy,

8   that might be hopeful thinking.  And I don't think as an

9   individual that that is a realistic outcome of letter

10  writing.

11  Q    When you say not a realistic outcome, not rational

12  thought that if you write letters threatening government

13  officials and asking them send me millions of dollars, it's

14  not going to happen, would that be fair?  That's not rational

15  thinking?

16  A    Again, the motivation for these letters I do not know.

17  I do not think that that's a realistic outcome from these

18  letters.  I do not know Ms. Nelson believed that that in fact

19  would be the outcome of these letters or whether the other

20  part of the letters which are more threatening and menacing

21  was the intention or whether there was some other motivation.

22  I'm not able to discern that from this point in time but I do

23  not think that that, from my perspective that that would have

24  been a reasonable outcome from those letters.

25            THE COURT:  I think I understand.

1          MS. BIANCO:   Okay.

2    Q    Let's go back to the IQ scores done in 1992.  That was

3    over thirty years ago, is that right?

4    A    1992, yes.

5    Q    And a full scale IQ, that's Defendant's Exhibit 11, full

6    scale IQ is 76, verbal is 72.  We went over that, correct?

7    A    Yes.

8    Q    And there is a standard error of measure for this test,

9    is that right?

10   A    Yes.

11   Q    It could be off plus or minus three points?

12   A    Generally three to five points, yes.

13   Q    Three to five, correct?

14   A    Yes.

15   Q    So her full scale IQ could be as low as 71 and her

16   verbal IQ could be as low as 67, correct?

17   A    Yes.

18   Q    And that would be in the mentally retarded range, is

19   that right?

20   A    71 would not be, no, that's borderline.

21   Q    But 69 would be, correct?

22   A    Again, because one or two point difference in reality

23   does not make a difference for the individual, so at that

24   point we would really look at adaptive functioning and that's

25   how you would determine whether or not this individual really

*Miriam Kissin - Cross - Ms. Bianco*                    61

1   belongs in the borderline or the intellectual disability.

2   Mental retardation is not a phrase that's used any more, it's

3   intellectual disability.

4   Q    Let's look at the adaptive functioning which you just

5   talked about.  And that would be in her social realm,

6   correct, looking at how she lives her life, right?

7   A    She wouldn't fall into that category in any case, it

8   would be 71.  71 would not fall into intellectual disability.

9   Q    Well, on the verbal IQ?

10  A    It's not part of it, it's the full scale that you would

11  look at.

12  Q    Let's talk about her adaptive functioning, because you

13  brought that up?

14  A    Sure.

15  Q    And adaptive functioning has to do with the way she

16  deals with life and how she handles herself, correct?

17  A    It's a very concrete thing, so ability to care for one's

18  needs such as food, shelter, be able to speak in a way that

19  other people can understand.

20  Q    Whether they can have a bank account, right?

21  A    Someone in the borderline range may or may not be able

22  to fully manage their money.  They might be able to be

23  taught, but certainly there might be some limitations into

24  how sophisticated their ability to manage money could be.

25  Q    Let's talk about Dennis' adaptive functioning.  She's

*Miriam Kissin - Cross - Ms. Bianco*

1  been in prison almost her entire life, correct?

2  A    Yes.

3  Q    She hasn't been able to care for herself, correct?

4  A    So, you would look at her adaptive functioning within

5  the setting where she is.  So, meaning does she need help in

6  the prison setting, which is where she lives, to be able to

7  follow the routines, be able to engage with individuals if

8  she chose to do so, to be able to interact.  It's a very sort

9  of concrete bar, it's not -- so, it's not necessarily being

10  able to do things at a high level but it's being able to

11  basically care for one's self in one's own environment.

12  Q    And she's been in a mental health unit almost the entire

13  time she's been in prison, correct?

14  A    She's been in institutions, some type of institution,

15  correct.

16  Q    And you wouldn't classify her adaptive functioning as

17  high, would you?

18  A    I would -- well, I would classify her adaptive

19  functioning as adequate in the setting that she's in.  There

20  is no indication that she needed specific help more so than

21  anybody else in the environment around adaptive functioning.

22  Q    Well, she's swallowing various objects that are harmful

23  to her, correct?

24  A    So, that would not be mixed into adaptive functioning;

25  that really has to do with her mental health diagnosis.

*Miriam Kissin - Cross - Ms. Bianco*                          63

1    Certainly wouldn't argue that she has acted adaptively in

2    terms of her mental health.  In fact, her diagnosis is

3    specifically maladapt, the core of it is maladaptive

4    behaviors.  That's mixing of two things that are not meant to

5    be mixed.  We're talking about just in her intellectual

6    capacities.

7         So, if she were to have an IQ score of less than 70,

8    which she doesn't, but if she were to and we needed to make a

9    determination whether she most belongs in the borderline kind

10   of functioning type of person or if she most functions like

11   someone who's intellectually disabled, we would look at her

12   adaptive functioning.  That doesn't have to do with any

13   mental health symptoms that would go on because mixing those

14   two together could really confound intellectual functioning.

15   You would only look at can she care for herself?  Can she

16   take care of her body?  Can she take care of her physical

17   needs?  Can she interact with other people?  You know, from a

18   cognitive perspective, does she know how to ask for things?

19   Does she know how to follow rules, follow directions, things

20   of that nature?

21        So, I would say that her adaptive functioning is not

22   showing that she's functioning at a lower level than her IQ

23   score.  I think that she's functioning very consistently with

24   someone in the borderline range.

25   Q    Okay.  And you said it had to do with adaptive

1   functioning, her ability to get along with people,

2   interpersonal relationships, is that what you said?

3   A    No, I didn't say that.  Her ability to interact, so

4   again ask for things, talk to other people, ask questions, be

5   able to understand them answering questions, knowing if she

6   has a question.  Again, it's pretty concrete.  And again,

7   that would only come into play if her IQ score was lower than

8   it actually is.

9   Q    Okay.  Now the IQ test, that was the WAIS-R test at the

10  time, correct, in 1992?

11  A    Yes.

12  Q    And the IQ test measures many different cognitive

13  functioning in certain subtests, correct?

14  A    Correct.

15  Q    There are verbal comprehension subtests?

16  A    Yes.

17  Q    And many of these measure memory, abstract reasoning,

18  the ability to evaluate and use past experiences?  Those are

19  some of the subtests on the WAIS-R, correct?

20  A    Correct.

21  Q    Some measure the ability to comprehend, correct?

22  A    Correct.

23  Q    For example, the digit scan subtest is a measure of

24  short term memory and the ability to pay attention, right?

25  A    Correct.

*Miriam Kissin - Cross - Ms. Bianco*                           65

1   Q    And the similarity subtest deals with a level of

2   abstraction, whether something is the same or different?

3   A    Yes.

4   Q    And there are certain scores for each subtest of the

5   WAIS IQ test, correct?

6   A    Yes.

7   Q    We don't have any of the subtest scores from the 1992

8   test?

9   A    Well, this is a -- we have the --

10  Q    The subtest, do we have any scores of the subtest?

11  A    On this report I do not see it, no.

12  Q    And a more revised IQ test came out since the

13  publication of the WAIS-R, correct?

14  A    There has been two actually since then.

15  Q    And the more recent one would be the WAIS-IV, is that

16  right?

17  A    Yes.

18  Q    On March 22, 2022, I asked you whether you can conduct

19  an IQ test on Ms. Nelson so I can assess how intellectually

20  impaired she may be.  I was very concerned about Ms. Nelson's

21  understanding and cognition when I speak with her.  Her

22  stated goals are entirely inconsistent with her actions.  Do

23  you remember me sending you that email?

24  A    I believe so.

25  Q    And you refused to perform a new IQ test, yes or no?

*Miriam Kissin - Cross - Ms. Bianco*                         66

1  A    Well, I indicated that she had testing done.

2  Q    Thirty years ago, right?

3  A    Those scores would not change.

4  Q    Okay.  Let's talk about her ability to assist her lawyer

5  in her own defense.

6         THE COURT:  Why don't we take a break.  I'm

7  assuming you've got a ways to go.

8         MS. BIANCO:  I do.

9         THE COURT:  We're going to take a five minute

10  recess, resume at 3:00.

11         (2:57 p.m., recess.)

12         (3:04 p.m., reconvene.)

13  Q    Now, it's your testimony that Dennis has sufficient

14  present ability to consult with his lawyer -- with her lawyer

15  in implementing a defense with a reasonable degree of

16  rational understanding, is that correct?

17  A    Yes.

18  Q    Let's talk about that.  Now, your evaluation was

19  conducted from September 9, 2021 through November 30, 2021,

20  is that right?

21  A    Correct.

22  Q    And Dennis was willing to meet with you for your

23  interviews, yes?

24  A    Yes, with one exception.  She cut one short but did

25  indicate that she was willing to meet again and she did.

*Miriam Kissin - Cross - Ms. Bianco*

1   Q    But your interviews were conducted in a controlled

2   environment, correct?

3   A    It was in a prison.

4   Q    And you could speak with her any time you wanted to at

5   the prison?

6   A    Yes.

7   Q    She didn't have the ability to hang up the phone on you?

8   A    It was not done by phone, no.

9   Q    And you said even with this she had one incident where

10  she cut the interview off and walked away?

11  A    Well, she said that she didn't want to continue at that

12  time.  She did engage with me and she was -- we were in the

13  middle of an interview, just had started, she said that she

14  didn't want to continue, and I said that would be okay and

15  she got up and left.

16  Q    And fair to stay you never had to deal with Ms. Nelson

17  by talking on the phone?

18  A    No.

19  Q    So hypothetically if you arranged for a telephone call

20  with Dennis and she refused to come to the phone to speak

21  with you, would it be your opinion that she had the

22  sufficient present ability to consult with her lawyer if she

23  refuses to speak with you?

24  A    Well, so refusing to speak with me would not have

25  anything to do with capacity, it would be with her will at

1  that time, so that would not speak to her capacity.  I would

2  not know whether she has the capacity or not but I would know

3  that she did not have the will at that moment to speak to me.

4  Q    Well, you would agree that a person in order to work on

5  their defense, they have to understand the nature of the

6  proceedings, right?

7  A    Correct.

8  Q    And the nature of the proceedings would be the

9  defendant, the person accused, talking with their lawyer,

10 yes?

11 A    That would be part of the preparation for the

12 proceedings, correct.

13 Q    So hypothetically if ever time Ms. Nelson got on the

14 phone and hung up without provocation after one or two

15 minutes, would it be your opinion that she understood what

16 the role of her lawyer is supposed to be when she's refusing

17 to speak with her?

18 A    Again, I don't know that that would give me any

19 information about her understanding the role of her lawyer.

20 It would show me that she may have a disagreement, or a

21 distress tolerance, not willingness, lack of interest.  There

22 is a lot of things that would not give me any information in

23 terms of her capacity, it would not be helpful in terms of

24 the actual conversation as it wouldn't take place.

25 Q    Well, it would impede her ability to help presenting a

1  defense if she refuses to speak with her lawyer, correct?

2  A    It would impede her mounting a defense; it would not

3  speak to capacity.

4  Q    So, mounting a defense, if she doesn't want to speak

5  with her lawyer, she hangs up on her lawyer, that would

6  impede her ability to mount a defense, yes?

7  A    Not engaging with her lawyer may certainly impede her to

8  ability to mount a defense with her lawyer, yes.

9  Q    In reviewing the materials in this case, you found that

10 Dennis had a pattern of interpersonal difficulties, is that

11 right?

12 A    Yes.

13 Q    She had problems getting along with staff, correct?

14 A    At times, yes.

15 Q    She had problems getting along with other inmates or her

16 peers, yes?

17 A    Yes.  At times, yes.

18 Q    And this occurred at numerous facilities, yes?

19 A    Yes.

20 Q    And it occurred over the course of years?

21 A    That's correct.

22 Q    With respect to Dennis' interpersonal difficulties,

23 would you agree that her difficulties derived from a

24 combination of her psychiatric, psychological, cognitive

25 problems, i.e. her personality disorder, delusional disorder,

1   and poor understanding?  Would you agree with that statement?

2   A    I do not believe that her difficulties are resultant of

3   a delusional disorder.  I do believe that they are resultant

4   of her personality disorder and possibly some additional

5   contribution from intellectual limitations in that her

6   thinking is not very sophisticated, so that can also have

7   some -- undermine sort of her ability to kind of understand

8   the information that's being given to her.

9   Q    Would you agree with this statement, agree that her

10  difficulty getting along with people is symptomatic of

11  underlying deficits, not because she got up in the morning

12  determined to make her life more miserable?  Would you agree

13  with that statement?

14  A    I would agree that she's not trying to make her life

15  more miserable.

16  Q    Okay.  But it could be symptomatic of her underlying

17  deficits, her inability to get along with people?

18  A    Certainly.

19  Q    Would you agree that the synergy between her mental

20  disorders has created lifelong problems for her in her

21  ability to navigate any environment?

22  A    I would say that's a fair statement, yes.

23  Q    Would you agree that Dennis' interpersonal difficulties

24  can affect her ability to consult with counsel?

25  A    I don't believe that it would interfere with her

*Miriam Kissin - Cross - Ms. Bianco*                    71

1  abilities to.  I believe that it could interfere with her

2  willingness and tolerance of hearing things she may not like

3  and be able to continue conversations in that context, yes.

4  But I do believe she has the capacity to consult.

5  Q   She has the capacity to consult, but possibly only for a

6  very, very short time, would that be fair?

7  A   It would vary.  She sat through multi hour interviews

8  with me and with other providers most of the time, although

9  there were sometimes, including the one I mentioned, where

10 she was frustrated over something, I'm not even clear what it

11 was, and cut that particular interview off.  So I would say

12 it varies, her willingness to engage.

13 Q   Her interpersonal abilities and problems have affected

14 her mental health treatment, would you agree with that?

15 A   Yes.

16 Q   And I want to direct your attention to a particular

17 encounter on 2/24/21, Defendant's Exhibit 5, at the Bureau of

18 Prisons with mental health professionals.  She participated

19 briefly before terminating the conversation by putting a

20 blanket over her head and not answering any further

21 questions?

22 A   Yes.

23 Q   And that is something that she has a habit of doing,

24 walking away, stopping, refusing to communicate, would you

25 agree with that?

*Miriam Kissin - Cross - Ms. Bianco*

1  A    I believe that there is multiple examples of something

2  like that, I would say that's a clear assessment, yes.

3  Q    And in reviewing the materials in this case, you found

4  that Dennis had an extensive history of difficulty tolerating

5  and regulating anger and distress without resorting to

6  extreme reactivity?

7  A    Yes.  That's consistent with her diagnosis, yes.

8  Q    And you state, "When attempting to manage extreme

9  emotions, she resorts to self harm such as cutting herself,

10  inserting objects in her body, and destroying property and

11  biting herself," yes?

12  A    Yes.

13  Q    You agree that a criminal charge and a trial can cause a

14  person a significant amount of distress?

15  A    It can, it certainly can.  It varies from individual to

16  individual and times in their lives, but I could see that's

17  stressful for most individuals.

18  Q    Well, a person like Dennis who has a low tolerance for

19  distress, he would -- she would resort to extreme reactivity

20  if she has a low tolerance for distress, correct?

21  A    Again, I think that's a generalization.  I've engaged

22  with her around issues about the charges and she was able to

23  tolerate that.  Although again, there might be times or

24  specific situations that come up that can be more triggering

25  and she can react in a more extreme way, but to date around

*Miriam Kissin - Cross - Ms. Bianco*                    73

1   these particular charges that is not the way that she's

2   responded.

3   Q    Okay.  Do you agree that Dennis' low tolerance for

4   distress can affect her ability to consult with counsel?

5   A    It can interfere at specific times in that she might

6   withdraw from conversation or terminate a specific meeting,

7   that can certainly happen.

8   Q    And in the course of a trial, a person accused of a

9   crime may need to consult with their lawyer during the course

10  of the trial, correct?

11  A    If they choose to do so, certainly, yes.

12  Q    And if a person has a low tolerance for distress and

13  then just shuts down and, for example, puts their head on the

14  desk, would they be able to effectively communicate with

15  counsel during a trial?

16  A    I don't believe that that has anything to do with

17  capacity.  I think that that has to do with the decision that

18  the person may make at the time.  Some people do have less

19  stamina because of maybe physical, maybe mental health

20  issues, and there might have to be some adjustments that

21  would be made.  Again, I'm speaking in the abstract.  But

22  that does not speak to capacity, that speaks to particular

23  choices individuals might make at a particular junction in

24  the proceedings.

25  Q    Well, I'm asking you if a person like Dennis shut down

1    during the course of a trial, okay, would they have the

2    present ability to consult with her lawyer if she shuts down,

3    puts her head on the table and won't speak?

4    A    Yes, because my opinion is that Ms. Nelson does not have

5    a mental disease or defect that undermines her capacity to

6    consult with her attorney as well as participate in the legal

7    process.  That does not guarantee that she or anyone with the

8    same capacities would actually do that or make decisions

9    about what they should do in their case.

10   Q    You talked to Dennis about her understanding of the

11   trial participants and process, correct?

12   A    Yes.

13   Q    Would you agree that Dennis gave you many wrong answers

14   which you had to correct?

15   A    Um, yes, so part of --

16   Q    That was a yes?

17   A    Yes.  Well, I'm going to go back.  I'm not sure it was

18   many wrong answers, but there was some wrong answers and I

19   did have to make some corrections.

20   Q    She initially stated that, I, Randi Bianco, was hired by

21   her mother to defend her, yes?

22   A    I believe she said that.

23   Q    And you corrected her by telling her that I was a

24   federal public defender, correct?

25   A    Yes.

*Miriam Kissin - Cross - Ms. Bianco*                    75

1   Q     And only after you told her this did she acquiesce that

2   that actually happened, correct?

3   A     Yes.

4   Q     She was under this belief that her mother hired me,

5   correct?

6   A     That's what she said, yes.

7   Q     She initially told you that a jury is comprised of 18

8   persons, correct?

9   A     Yes.

10  Q     And you had to correct her that there were only twelve

11  people on a jury?

12  A     Yes.  I believe she was talking about six alternates,

13  but yes.

14  Q     Well, she had more misconceptions about the judicial

15  process, didn't she?

16  A     I believe there were some other things that I needed to

17  correct.

18  Q     She didn't know that a jury's decision had to be

19  unanimous, yes?  She didn't know that?

20  A     Yes, correct.

21  Q     You had to tell her what that concept meant?

22  A     Yes.

23  Q     And she didn't understand that until you told her?

24  A     She did not know about it, yes.

25  Q     Likewise, when you asked Dennis to discuss the role of

1   the evidence and witnesses, she said that evidence is used

2   to, quote, "make sure it is the right evidence, like letters

3   and my medical records, like I could show the jury if you had

4   a weapon," end quote.  Do you remember her saying that?

5   A    Yes.

6   Q    That doesn't make any sense, does it?

7   A    Well, it actually did make sense to me.  She gave

8   examples of evidence, people often do that.  It may not be a

9   very eloquent response but I did not think that that was --

10  that it didn't make sense.  It was not, you know, again a

11  very eloquent response.

12  Q    Not an eloquent response.  Well, if she was explaining

13  that to another person, you wouldn't have to decipher the

14  meaning of it, correct?

15  A    If she was explaining to another person?

16  Q    What she said to you, you had to extrapolate what she

17  meant, it wasn't a clear answer, is that right?

18  A    That's certainly part of my job, yes.

19  Q    And you explained to Dennis that evidence could be

20  presented by both the prosecution and the defense, yes?

21  A    Um --

22  Q    Exhibit 10, page 9.

23  A    Yes.  I don't recall what she said about it but I do

24  believe that I clarified that for her, yes.

25  Q    You had to explain that to her?

*Miriam Kissin - Cross - Ms. Bianco*

1    A    Yes.

2    Q    And only after you said that did she acknowledge those

3    facts to be true, right?

4    A    Yes.

5    Q    Did you ever wait a few minutes to go over these

6    concepts again to see if she actually remembered them?

7    A    So --

8    Q    That's a yes or no question.

9    A    At times she used those concepts in answering other

10    questions, but I did not wait specifically a few minutes and

11    then ask again.

12    Q    So you don't know if she actually recalled those

13    concepts or had the ability to comprehend them after she was

14    immediately told, true?

15    A    I have no reason to doubt she was able to comprehend

16    them.

17    Q    But you didn't test her to see if she comprehended them

18    a few minutes later, yes or no?

19    A    I did not test her a few minutes later, that is correct.

20    Q    Let's talk about Dennis' decision-making ability.  You

21    said that Dennis lacked intellectual sophistication which at

22    times undermines effective decision-making, correct?

23    A    Yes.

24    Q    Dennis had difficulty articulating the protection

25    against incrimination, correct?

1    A    Yes.

2    Q    She only expressed understanding when you described the

3    concept to her, correct?

4    A    I'm just going to review for a second because I

5    believe -- if you give me one minute to review.

6    Q    Sure.

7    A    I don't think that's what you pulled up.

8    Q    Page 9.  Sorry, apologies.

9    A    Okay, yes.

10   Q    So, you were explaining the process to her, correct?

11   A    Yes, yes.  Which is typical, yes.

12   Q    And she's acquiescing or saying that she understood,

13   yes?

14   A    Well, initially I asked her about it, which is just

15   typically what I would do and see how far the individual

16   might be able to answer, you know, organically on their own,

17   which was hard for her, she was not able to do that on her

18   own.  She talked about her own case, which I tried, again

19   because of that firewall to try to get her away from and try

20   to speak more in the abstract, which she had a hard time

21   doing.

22   Q    When you say she had a hard time speaking in the

23   abstract, she couldn't speak in the abstract, correct?  She

24   couldn't do it?

25   A    Well, that's very typical because individuals have only

1    their own cases and I try to remind them --

2            THE COURT:  Again, the question is about her, not

3    whether it's typical.

4    A    I'm sorry.  No, she had a hard time doing it in the

5    abstract.

6    Q    She couldn't do it, correct?

7    A    Well, she was trying to, she was trying but she kept

8    swerving into her own case, so she would kind of mix the

9    abstract with her own case.

10   Q    After you talked about the protection against

11   incrimination and she expressed her understanding, did you

12   wait a few minutes to talk about that concept again to see if

13   she actually understood it or remembered it?

14   A    Again, I did not wait a few minutes, but also because we

15   had spent some time on it and she ultimately answered

16   consistently and coherently.

17   Q    So the answer is no?

18   A    Well, I didn't have any questions that she understood.

19   Q    When you asked her how she would decide between

20   accepting a plea deal and proceeding to trial, Dennis became

21   frustrated when attempting to respond, yes?

22   A    Yes.

23   Q    She didn't know the answer, correct?

24   A    Well, there is no answer, that's her -- that's her own

25   opinion of how she would proceed.

1  Q    Well, she didn't have an opinion, she couldn't give you

2  anything, correct?

3  A    I'm sorry, I'm just going to reread this because I want

4  to make sure I give an accurate response.  Yes, that's

5  correct, she had a hard time, she became frustrated.

6  Q    So, you had to provide her with concrete clues and

7  examples to explain that, correct?

8  A    Yes.

9  Q    And she couldn't again talk about this concept in the

10  abstract, correct?

11  A    Yes.  She talked about her own case.

12  Q    And you talked to her about this concept for several

13  minutes before she was actually able to give you an answer,

14  yes?

15  A    Yes.

16  Q    And did you wait after you talked about this difficult

17  concept, wait a few minutes to see if she actually understood

18  or retained any of this information?  Did you wait?

19  A    What she ultimately said to me was from her, not from

20  me, so it wasn't information that I said to her that I was

21  then testing.  She ultimately gave me correct information, so

22  I didn't have any reason to think she wouldn't at another

23  time give me correct information.

24  Q    That was after several minutes of giving her concrete

25  cues, correct?

1  A     To steer her to specifically what I wanted her to talk

2  about.

3  Q     What you wanted her to talk about?

4  A     What I was asking her about, yes.

5  Q     Did you wait a few minutes and then see if she actually

6  remembered any of this and said tell me in your own words

7  what did we just talk about?  Did you ask her any of that?

8  A     Her response came from her, not from me.  I did not ask

9  for her to reiterate it because she initially was the one who

10 provided me with the correct response in the first place.

11 So, no, I did not a second time ask her the same thing.

12 Q     Well, did you ask her to describe what the concepts were

13 in different words other than the words that you gave her?

14 A     Well, I asked in many different words, which is why we

15 spent some time on it, when an individual may not be

16 understanding my questions initially, because human

17 conversation is not rigid.  Attorneys also can form things in

18 different ways.  My job is to educate.  The question isn't

19 whether someone knows something or doesn't know something,

20 unlike a test.  The job of evaluating competency is whether

21 the individual is able to learn the concept and be able to

22 understand the concept even if this might be the first time

23 that they're presented with it.

24 Q     And you don't actually know if that's the first time she

25 was presented with those concepts, correct?

*Miriam Kissin - Cross - Ms. Bianco*                    82

1   A    I don't believe it was the first time.  She's been

2   through other criminal cases so she may have certainly had at

3   least some version of those.  She didn't go to trial

4   necessarily so that may not have come up.

5   Q    Well, you're aware that she did go to trial on at least

6   one occasion, correct?

7   A    I believe there was at least one of the charges that she

8   went to trial.

9   Q    And she was arrested multiple, multiple times, correct?

10  A    Yes, she has multiple charges.

11  Q    And you had to explain all of these concepts to her

12  because she didn't understand them.  So you were educating

13  her, is that right?

14  A    About some of them, yes.

15  Q    And it appears that she wasn't retaining any of the

16  information from the years past from all of these other

17  charges, correct?

18  A    I wouldn't say she didn't retain any information but

19  there was some examples you gave, how many members might be

20  on a jury, and recalling that both sides can bring

21  information, as well as kind of some of these nuances

22  about -- and this is the more sophisticated part of

23  understanding a trial, so --

24  Q    Well, that's part of the competency?  She has to

25  understand the trial?

*Miriam Kissin - Cross - Ms. Bianco*                    83

1    A    Yes.  The decision-making part, yes.

2    Q    And for someone who has been arrested multiple, multiple

3    times, she didn't appear to have the information that you

4    would think that she would know after being arrested so many

5    times to be sitting with you where you have to educate her,

6    yes?

7    A    Again, this is trial information.  Most of the time she

8    didn't go to trial, either she did not recall it or has

9    forgotten it, but certainly she did have previous experience

10   at least once with trial and with the legal system on

11   multiple occasions.

12   Q    Okay.  But she didn't understand some basic simple

13   concepts that you had to explain to her by giving her

14   concrete cues, yes?

15   A    No, I didn't say she didn't understand them.  She didn't

16   understand what I was getting at and what I wanted her to --

17   what the question was with what information I was trying to

18   get her to answer in terms of her accepting what would happen

19   if one went to trial versus accepting a plea and what might

20   be the benefits and pitfalls of doing those two things.  I

21   would not conceptualize that she didn't understand them.  I

22   think she had a hard time answering those things in the

23   abstract and I needed to conceptualize them in a few

24   different ways to get at her responses.  Her response was

25   ultimately correct, so I do believe that she understand the

1  concept, but she's someone that has a hard time answering

2  things in the abstract or not personalizing them, and that

3  may certainly be driven by lack of sophistication.

4        THE COURT:  Let's move on.

5  Q    So, in the end when you were talking to her about her

6  ability to make decisions, you assumed she had the ability to

7  understand after your conversations with her, correct?

8  A    I assessed her to have the ability to understand.

9  Q    You had never reached out to me, the defense lawyer,

10 correct?

11 A    Well, we had email exchange and I believe at the very

12 beginning of the evaluation that we did reach out, which is

13 why I received all that information from you.

14 Q    Okay.  You never reached out to me to ask what problems

15 I had with communicating with Dennis, did you?

16 A    Again, you did send a letter in the beginning saying

17 that any information that you might want to offer, including

18 records or any other information, we would like to have

19 because we're doing the evaluation, so, yes, my secretary

20 Rebecca Peterson did reach out to you.

21       THE COURT:  Did you ever speak to Ms. Bianco?

22       THE WITNESS:  By email.

23       THE COURT:  Did you ever speak by telephone?

24       THE WITNESS:  I don't believe we had a phone call.

25       THE COURT:  By email did you ask her about her

*Miriam Kissin - Cross - Ms. Bianco*

1  relationship with her client and her ability to communicate

2  with her client?

3          THE WITNESS:  No.  As we were saying, we reached

4  out, but no.  I reached out but I did not ask that particular

5  question, no.

6          THE COURT:  So, the email exchange was more about

7  gathering records?

8          THE WITNESS:  Well, it's something sent to all

9  attorneys when an individual comes in asking if there is any

10 information that they would like us to have and that would be

11 helpful for the purpose of the evaluation, and then we list

12 some things including records, things of that nature.

13         THE COURT:  So, the standard initial communication,

14 but you didn't have any particular conversations with

15 Ms. Bianco by email or by telephone with respect to her

16 communications and relationships with Ms. Nelson in this

17 case?

18         THE WITNESS:  I do believe, again, there was an

19 email that was initiated regarding the testing that

20 Ms. Bianco had referenced in the previously case, so she

21 actually had reached out and that was a response.

22         THE COURT:  That came out when the reports were

23 issued because I recall that conversation?

24         THE WITNESS:  Right.  You're correct.  Other than

25 that initial one and having responded to that, there was no

*Miriam Kissin - Cross - Ms. Bianco*

1    other.

2    Q    So, in your assessment, in your opinion you never

3    considered what Dennis' ability was like with her actual

4    attorney because you never sought out that information, is

5    that right?

6    A    I'm not sure.  Again, so there was a evaluation

7    requested for competency which indicated that there was a

8    concern about Ms. Nelson's competency related capacities.  So

9    that would have spurred the evaluation in the first place, so

10   certainly I did understand that there was difficulty in terms

11   of communication.

12   Q    But you never asked, you never reached out, you never

13   tried to find out what the communication problems were

14   between Dennis and his present attorney and what was going

15   on, correct?

16   A    I did not speak to you directly about it, that is

17   correct.

18   Q    So, whatever was going on between Dennis and his

19   attorney wasn't considered in part of your evaluation?

20   A    Well, I did speak to the Dennis about her relationship

21   with her attorney.

22   Q    And when Dennis told you that all I was interested in

23   was talking about his mother and getting his medical records,

24   you assumed that to be factually correct?

25   A    Um, the reason I asked about that is to understand

1   whether there might be some type of problems driven by mental

2   illness that might be interfering with the relationship.  So

3   again, specifically there could be some beliefs about the

4   attorney or the process that might interfere.  I'm not sure

5   that I thought that everything that he stated about his

6   relationship with you is absolutely true.  I do believe that

7   the issue about getting records was probably somewhat

8   consistent with reality; I'm not sure about the mother piece.

9   Q    So, part of his explanation to you may not have been

10  based in reality, but you never followed up to see if it was

11  or wasn't true, correct?

12  A    I didn't think it was not based in reality; I didn't

13  think that it was driven by mental illness.

14  Q    And my last question is, if a person has a delusional

15  disorder, no amount of facts and reasoning can shake their

16  thinking, is that a fair statement?

17  A    That is kind of the crux of a delusional disorder, that

18  providing true information does not dissuade them from their

19  beliefs, yes.

20         MS. BIANCO:  I have no further questions.  Thank

21  you very much, Doctor.

22         THE COURT:  Mr. Eurenius, do you have any redirect?

23         MR. EURENIUS:  One question, Your Honor.

24  *REDIRECT EXAMINATION BY MR. EURENIUS:*

25  Q    Dr. Kissin, did any of the federal defender's

1   questioning today or any review or rereview of the documents

2   presented to you change your opinion about the conclusion

3   that the defendant is mentally competent to stand trial?

4   A    It did not.

5           MR. EURENIUS:  No further questions, Your Honor.

6           THE COURT:  Let me ask you, Dr. Kissin, and I

7   apologize if you've been asked this and I missed the answer.

8   I know that you have given your opinion with respect to

9   competence.  I just want to make sure that I understand.  You

10  have diagnosed the defendant as suffering from borderline

11  personality disorder, correct?

12          THE WITNESS:  Yes.

13          THE COURT:  Is that considered a mental illness?

14          THE WITNESS:  It's under the personality disorders

15  portion of the DSM.  It is different than mental illness and

16  would not typically or really ever be considered a diagnosis

17  that would drive an opinion of incompetency.  It is not a

18  major mental illness.  That does not necessarily mean that it

19  does not create problems for the individual or those around

20  them, but it is not considered a major mental illness like

21  psychosis or mood disorder.

22          THE COURT:  Is it a diagnosable mental disorder

23  according to the DSM?

24          THE WITNESS:  Yes.

25          THE COURT:  Are you saying that in your experience

*Mariam Kissin - Examination by The Court*                    89

1    no one who is diagnosed with borderline personality disorder

2    would be found not competent to stand trial?

3              THE WITNESS:  That is -- well, I'm going to step

4    back.  I don't know that I know the entirety of the record

5    and there might be a case that that's happened.  That would

6    be incorrect because that is not in the spirit of what would

7    drive incompetency.  Again, I'm going out a little bit on a

8    limb in terms of judging what would be a correct, incorrect

9    finding by a judge.  Because personality disorders are not

10   something that you would treat with medication typically,

11   although some aspects of them could be treated.  Some of the

12   impulsivity and some of the mood components of borderline

13   personality disorder would respond to medication, which is

14   why antipsychotics could actually be very helpful because it

15   kind of tones down some of that reactivity.  But these

16   individuals are not unrooted in reality, they are not driven

17   by delusions, not driven by auditory/visual hallucinations,

18   not driven by mood symptoms such as mania.  Those are the

19   kind of things that when in the throes of those, competency

20   can be compromised.  These are really more skill-based

21   problems and the treatment for them is really providing

22   individuals better skills to interact with other people and

23   their environment.

24              And so it is not the same.  Borderline personality

25   disorder is probably one of the more severe personality

*Mariam Kissin - Examination by The Court*                           90

1   disorders because it comes with often behaviors that are

2   really problematic, and mood symptoms as well, and they could

3   be overwhelming to individuals around them.  But it's not

4   treated in the same way that you would with a mental illness.

5           THE COURT:  For somebody who has had a borderline

6   personality disorder for many, many, many years, is it fair

7   to assume that after decades of laboring with this mental

8   illness, that the person is less likely to develop the skills

9   necessary to conform their behavior to appropriate social

10  norms than if you're dealing with somebody who is diagnosed

11  at age twenty, for example?

12          THE WITNESS:  So, I would say that someone at age

13  twenty could also have very significant difficulties

14  conforming to social norms, sometimes even more so in some

15  ways than those that might age out, some of those behaviors.

16  In fact, you actually see a decline in some of those

17  behaviors over time just like you would with a lot of

18  behaviors as people age.

19          The reason that it matters that it's skill based

20  versus psychosis or mood based is that it's -- individuals

21  are not -- they don't have a perception of reality that's

22  different in other individuals.  They're understanding what

23  their role in that and how do they get their needs met is

24  different.  They share a reality but what they interpret in

25  terms of what people mean when they say and what people --

*Mariam Kissin - Examination by The Court*                    91

 1   their assumptions about what people's motivations are are

 2   problematic, are usually off base.

 3           And I'm sorry, Your Honor, if I may.  The issue

 4   with competency is also the capacity is compromised but it's

 5   not undermined, it's not an issue of not having the capacity.

 6   These individuals' behavior sometimes interferes with their

 7   otherwise capacity that they have when they're not behaving

 8   in those ways.

 9           THE COURT:  Okay.  I think I understand the

10   theoretical distinction that you're drawing.  I think in the

11   application it's harder to understand.

12           If somebody suffers from borderline personality

13   disorder such that, for example, being in stressful

14   situations makes them more prone to behaviors that interfere

15   with the functioning of a trial which interferes with an

16   attorney's ability to consult and confer in a meaningful way

17   with his client, or her client, then I'm not sure that I

18   understand the theoretical distinction.  They have the

19   capacity, but if the capacity is so diminished as a result of

20   certain stressors that they can't function, is it reasonable

21   to expect that they're going to be able to get through a

22   trial and assist properly in their defense?

23           And I understand the standard is capacity to assist

24   in their defense, but if we know enough from their history to

25   know that there are certain experiences and certain stressors

 1    that are likely to trigger these behaviors, and we know that

 2    generally a trial can be a pretty stressful experience, isn't

 3    it reasonable to assume that assisting counsel is going to be

 4    very difficult?

 5            THE WITNESS:  That may be true with all personality

 6    disorders.  For example, antisocial personality disorder,

 7    which is another diagnosis, you could sort of say the same

 8    thing, an individual might perceive -- may not be willing to

 9    work with their attorney because they -- or maybe even a

10    narcissistic personality disorder, they might feel like they

11    know better, they might think their attorney is not good

12    enough, may feel like their attorney is not providing good

13    enough counsel to them because it's not special, they don't

14    feel like they're being treated special.  And that certainly

15    might disrupt.  In fact, it might completely interfere with

16    their managing a defense, but that would be because of their

17    personality and not because of a mental illness.  I'm

18    certainly not saying that it would not create problems.  In

19    fact, it could certainly create problems.  It's not the type

20    of problem that is conceived as a mental illness.

21            THE COURT:  We've been going at this now for

22    started at 1:30 and it's now quarter of four, assuming that

23    clock is right, we've been going at it for a while.  The

24    defendant has for the majority of the time had his head on

25    the table.  It's very difficult to make any assessment by me

*Mariam Kissin – Examination by The Court*

1   as to a degree of engagement, but it's unusual.  I do a lot

2   of proceedings, I don't typically have defendants who have

3   their head on the table for most of the proceeding and don't

4   appear to be attentive or engaged.

5          I would like to know, do you make any assessment

6   from that?  Do you think there is any significance in what

7   you have observed today?

8          THE WITNESS:  Well, I know Ms. Nelson has the

9   capacity to engage because she has done that with me for

10  extended periods of time.  I also know that there are times

11  she decides she doesn't want to; she may be bored, she may be

12  disinterested, she might be tired, and so that takes

13  precedence.

14         THE COURT:  I guess I'm asking you because you

15  talked to her for far longer than I have, perhaps longer than

16  Ms. Bianco has based on the questions that she's asked, and

17  probably Mr. Eurenius I assume has not spoken to the

18  defendant.  So, as the person in the courtroom who may be

19  best able to answer this question, are you able to offer any

20  insight or opinion as to what, if anything, can be drawn from

21  the fact that the defendant has sat with her head on the

22  table for the majority of the proceeding?  Do you have an

23  opinion as to whether -- and I accept that she engaged with

24  you, so do you have an opinion that this is malingering?  Do

25  you have an opinion that the stress is overwhelming?  Do you

*Mariam Kissin - Examination by The Court*

1   have an opinion that it is antipsychotic medication that is

2   helping to control behavior but it is making it difficult to

3   pay attention for long periods of time?

4           THE WITNESS:  I would say I wouldn't characterize

5   it as malingering.  I don't think that Ms. Nelson is trying

6   to behave in way that is not consistent with how she is, I

7   don't think that's part of the picture that I have seen.  I

8   think she does have health conditions, she has significant

9   underlying health conditions.

10          THE COURT:  It's been a long drive here.

11          THE WITNESS:  So, again, I'm not a physician but I

12  know that she does -- she's in poor health and she has poor

13  stamina, and if I had to guess, I would say that it might be

14  some combination of perhaps some physical fatigue and some

15  disengagement because of that, you know.  I would probably

16  ask her if I was interviewing her what might be going on, but

17  she's in poor health, separate from the psychiatric.  And the

18  medications that you mentioned do have some sedating

19  qualities as well, but I think that a more significant

20  physical problem, the blood condition that she has.

21          THE COURT:  But your observations today, have they

22  led you to -- have they caused you to have any questions

23  about any of your opinions today?

24          THE WITNESS:  I don't think I really have much

25  information from my observation other than perhaps some

*Mariam Kissin – Examination by The Court*

1   fatigue, that I don't think that I received any information

2   that one way or the other in terms of her behavior.  And

3   she's, generally I think she's somewhat -- it's not

4   inconsistent with her presentation usually.  I think she

5   didn't do a lot at Devens, she spent a lot of time kind of in

6   her room, and so I don't know how long she can last

7   physically, you know, in a day of testimony and such.  I

8   think that's what we're seeing.  But again, just making an

9   educated guess.

10          THE COURT:  Thank you, Dr. Kissin.

11          Okay.  Anything else?

12          MR. EURENIUS:  No, Your Honor.

13          THE COURT:  Dr. Kissin, thank you very much.  I

14   appreciate your assistance today and safe travels.

15          THE WITNESS:  Thank you.

16          THE COURT:  Mr. Eurenius, do you have any

17   additional witnesses?

18          MR. EURENIUS:  I do not, Your Honor.

19          THE COURT:  How about you, Ms. Bianco?

20          MS. BIANCO:  No, Your Honor.

21          THE COURT:  Ms. Bianco, would you like to put in a

22   post-hearing submission?

23          MS. BIANCO:  Yes, I would.

24          THE COURT:  And I'm assuming you would like to see

25   the transcript before?

*Mariam Kissin – Examination by The Court*

1        MS. BIANCO:  I would, please.

2        THE COURT:  I'm not sure how it's done in the

3   Northern District in terms of ordering that, but I assume you

4   all know how to do that and if you would please complete

5   whatever orders are necessary.  And Ms. Bianco, how much time

6   would you like after the transcript is prepared?

7        MS. BIANCO:  Judge, I'm starting a trial on

8   June 13th, so I guess I would ask -- I hate to say this, but

9   I would ask for ninety days because by the time we get the

10  transcript it will be right on heels of my trial and it may

11  take me a few weeks to actually put a submission together.

12       THE COURT:  I'm assuming it will take about thirty

13  days for the transcript to be prepared.  Mr. Eurenius, would

14  you like to put in a post-hearing submission?

15       MR. EURENIUS:  Judge, I'll work with Ms. Bianco.  I

16  don't know right now.

17       THE COURT:  That's fine.  I would like to certainly

18  hear from defense counsel if there is something that she

19  would like me to consider.  So ninety days.

20       THE CLERK:  August 1st.

21       MR. EURENIUS:  Judge, may the witness be excused?

22  I know she's got a flight.

23       THE COURT:  Sure, yes.

24       THE WITNESS:  Thank you, Your Honor.

25       THE COURT:  Good-bye.  Have a nice day.  Thank you

1    for your time.

2            Sure, how about August 1, how does that work?

3            MS. BIANCO:  That's fine, Your Honor.

4            THE COURT:  Thank you very much.

5            Mr. Eurenius, anything else?

6            MR. EURENIUS:  No.

7            THE COURT:  Ms. Bianco, anything else?

8            MS. BIANCO:  No.  Thank you, Your Honor.

9            THE COURT:  I thank everybody for their help today

10   in the Northern District.  Everybody has been very gracious

11   and thank you all for your assistance.  Nice to see you.

12   This is a nice courtroom.

13            THE CLERK:  Court's adjourned.

14            (3:48 p.m.)

15                    *            *            *

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4            I, EILEEN MCDONOUGH, RPR, CRR, Federal Official

5     Realtime Court Reporter, in and for the United States

6     District Court for the Northern District of New York,

7     do hereby certify that pursuant to Section 753, Title 28,

8     United States Code, that the foregoing is a true and correct

9     transcript of the stenographically reported proceedings held

10    in the above-entitled matter and that the transcript page

11    format is in conformance with the regulations of the

12    Judicial Conference of the United States.

13

14

15

16    _____
                *Eileen McDonough*

17                    EILEEN MCDONOUGH, RPR, CRR
                      Federal Official Court Reporter

18

19

20

21

22

23

24

25